**TRUNKLINE GAS COMPANY,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent.

No. 16223.

United States Court of Appeals
Fifth Circuit.

July 23, 1957.

Raymond N. Shibley, Washington, D. C., Lawrence K. Benson, New Orleans, La., and W. W. Prior, Houston, Tex., Steptoe & Johnson, Washington, D. C., of counsel, for petitioner.

Howard E. Wahrenbrock, Asst. Gen. Counsel, FPC, and Willard W. Gatchell, Gen. Counsel, FPC, Washington, D. C., David S. Lichtenstein, on the brief, for respondent, Federal Power Commission.

Before RIVES, JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The question here is whether the Federal Power Commission, having

ordered a full hearing into a phase of a Natural Gas Company's rate, can ignore the Examiner's findings favorable to the Company and adverse to the Staff's contention by retrospectively limiting the issues. We hold that any such action is an abuse of the administrative process and that the Commission may not do it.

Because Trunkline Gas Company (Trunkline) is owned by its largest customer, Panhandle Eastern Pipe Line Company (Panhandle), to whom it sells 98% of its gas, the tariff rate filed and approved by the Commission in 1951 is a unique cost-of-service formula in contrast to the traditional method of fixing the tariff charge to assure the specified rate of return on invested capital. Under such a tariff [1] Trunkline bills its customers monthly for an amount equal to its actual operating expenses for such month, including the cost of the gas being sold plus 1/12th of its annual income tax and 1/12th of the annual return (6%) on its net investment rate base. Thus a cost-of-service tariff produces a fluctuating rate from month to month and automatically limits the pipe line to the recovery of its actual costs, regardless of the volumes of gas it is able to sell. In other words, unlike a traditional operation, it has no means by which to offset unfavorable against favorable months or vice versa.

The pipe line's profit under this formula comes entirely from the allowance of the 6% return under Par. 3.4, note 1, supra, on the net investment rate base for (a) its plant and (b) working capital requirements as specified.

We are concerned here solely with the determination of that working capital allowance and whether, and to what extent, Federal income tax (and other tax) accruals collected by Trunkline monthly from its customers as a part of the cost-of-service rate under Par. 3.3, note 1, supra, are to be taken into account. The tariff prescribed a " * * * (b) Working capital allowance represented by the balance of necessary materials and supplies for operating purposes and one-eighth of cash operating expenses, exclusive of gas purchased for the preceding twelve-month period. * * *."

Though limited to these two factors, Trunkline was permitted to earn a return of 6% on a working capital allow-

[1]. This is covered by Rate Schedule P–1 filed and accepted by the Commission, Docket G.-882, October 2, 1951, 10 FPC 1395, in compliance with the conditions of the grant of the Certificate of Public Convenience and Necessity, Trunkline Gas Supply Company, 9 FPC 721 at 739, 729:

"3. Rate: For all gas delivered hereunder, the Buyer shall pay Seller each month an amount equal to the sum of the following amounts:

"3.1 Reasonable and necessary gas operating expenses for the billing month, reflected in accounts 701 to 809, inclusive * * *.

"3.2 One-twelfth of the annual depreciation expense computed by the application of an annual straight line depreciation rate of 3.5% to the actual legitimate investment in depreciable plant at the first day of the billing month.

"3.3 Accruals recorded for the billing month with respect to income and other taxes associated with natural gas opera-

tions and adjustments of accruals for tax expenses previously billed.

"3.4 Return at an annual rate of 6% computed for each monthly bill by the application of the monthly rate of 0.5% to the net investment rate base, determined as follows:

"As of the date of initial operation, and at the end of every sixth month thereafter, a net investment rate base shall be calculated from the sum of the following items:

"(a) The actual legitimate original investment in gas plant in service less the balance in depreciation reserves and contributions in aid of construction.

"(b) Working capital allowance represented by the balance of necessary materials and supplies for operating purposes and one-eighth of cash operating expenses, exclusive of gas purchased for the preceding twelve-month period. * *.

"3.5 Credits for gas revenues collected under other rate schedules and contracts, other gas revenues and amounts included in Accounts 508 and 509 * * *."

ance [2] of $1,462,148. Trunkline was apparently satisfied with this basis even though no allowance was made in working capital for (1) prepayments of certain expenses, insurance premiums, utility deposits, etc., (2) lag between the date of payment for gas purchases and reimbursement for gas sold to its customers, (3) necessary minimum bank balance. Such acquiescence or satisfaction may well have been due to the fact that up to the institution of the action involved here, the Commission had not required any credit against this working capital representing the amounts of cash on hand from time to time from Federal income tax accruals collected monthly from customers. Since these (for a sample year 1954) totaled $3,209,726, such accruals, or any substantial percentage of them deemed available for current use, could or might wipe out all or most of the working capital allowance of $1,462,148.

When Trunkline, correctly anticipating that it carried with it overtones of a coercive order if compliance was not voluntary, refused to follow the suggestion in the Commission's letter of May 6, 1955, the Commission on June 8, 1955, instituted this proceeding in Docket No. G–9034. That letter suggested that Section 3.4(b) of Rate Schedule P–1, note 1, supra, should be revised to provide that working capital allowance should be computed by reflecting therein a credit for the average of the income tax accruals in accordance with practice followed by the Commission and upheld by the Courts [3] in other cases.

This Order instituting investigation recited that in Docket G–2506 the Commission had suspended a proposed $12,-000,000 increase by Panhandle based upon asserted increases in Panhandle's costs for substantial volumes of gas purchased from Trunkline, its affiliate. As this is computed on a cost-of-service formula which included a working capital allowance to Trunkline without credit for income tax accruals, in order to determine whether Panhandle's rates are unjust, it is necessary to investigate Trunkline's rates "insofar as they relate to working capital."

But after these recitals, the Order stated that "the Commission *finds:* It is necessary * * * in the public interest * * * that an investigation be instituted by the Commission * * * concerning the rates, charges * * * collected by Trunkline * * * and any * * * regulation, practice * * * affecting such rates * * * insofar as they or any of them relate to working capital as provided in the formula set forth in subparagraph 3.4(b) of Rate Schedule P–1 * * * ."

This was twice repeated with specific emphasis in the order portion:

"The Commission *orders* :[4]

"(A) An investigation * * * is instituted * * * :

"(i) To determine whether any rate * * * collected by Trunkline * * * or any rule, regulation, * * * affecting such rate * * * is unjust, unreasonable, unduly discriminatory or preferential insofar

---

2. Materials and supplies for operating purposes on hand     $1,074,506.00
Needed for operating expense during lag between disbursement and reimbursement     387,642.00
$1,462,148.00

3. The Commission relied, and still does, on Alabama-Tennessee Natural Gas Co. v. Federal Power Commission, 11 FPC 75, 94 PUR NS 426, Op. 226, affirmed 3 Cir., 203 F.2d 494, and Northern Natural Gas Company, 11 FPC 375, 95 PUR

NS 289, affirmed in part Northern Natural Gas Co. v. Federal Power Comm., 8 Cir., 206 F.2d 690, 714, 715, certiorari denied 346 U.S. 922, 74 S.Ct. 307, 98 L. Ed. 416.

4. Par. (A) (ii) further provided: "If, after hearing, it shall find that any such rates, charges * * * rules * * * are unjust, unreasonable * * to determine and fix by appropriate order * * * just, reasonable, non-discriminatory or non-preferential, rates * * * regulations * * * to be hereafter observed * * *."

as they or any of them relate to working capital as set forth in subparagraph 3.4(b) of Rate Schedule P–1 * * *.

> \* \* \* \* \* \*
> "(B) Pursuant to * * * Sections 5 and 16 of the Natural Gas Act [15 U.S.C.A. §§ 717d, 717o] * * * a public hearing be held on June 28, 1955 * * * concerning the lawfulness of the rates, charges * * * rules, regulations, * * * contained in Trunkline's tariff insofar as they or any of them relate to working capital as provided for in the formula set forth in subparagraph 3.4(b) of Rate Schedule P–1 * * *."

Extensive hearings were held June 28, 1955, through July 25, 1955, resulting in the Examiner's report and order of January 16, 1956. In that hearing, by its own exhibits, testimony from its own witnesses and cross examination of the Commission's Staff experts, Trunkline proceeded, as the Order permitted, to make a full showing concerning the items in and affecting the working capital allowance of the Rate Schedule, note 1, *supra*. This took three forms: first, changes in the amounts for materials and supplies and the operating expense lag then allowed in the amount of $1,462,148, note 2, *supra*; second, a new allowance for the items of gas purchases lag, prepayments and minimum bank balances; and, third, the offset for Federal income tax accruals should not exceed the maximum amount (33.34%) of such accruals constantly in the custody of the company and available at all times for its use.

A full opportunity was available to the Commission Staff to rebut this evidence by cross examination or independent proof. From the Examiner's action in overruling their objections to the evidence as not within the scope of the issues, it was evident that the Examiner did not "read" the Order of June 8, 1955, with the self-serving myopia of the Staff who seemed transfixed with the purpose of compelling Trunkline to do what had been "suggested" and in the way, and in the percentage, and in the average (65.5%) precisely fixed by the Staff. Except for a belated effort after the Examiner's Report to secure an Order from the Commission compelling the Examiner to reopen it for the introduction of rebuttal testimony, the Staff proceeded in complete indifference to the scope which Trunkline and the Examiner considered the Order allowed. And on that evidence, on those issues, the Examiner held generally in favor of Trunkline.

Where the Staff urged him to find 65.55% of tax accruals available (totaling $2,103,975) as a "credit" to wipe out the Staff's adjustment from $1,462,148 to an allowance figure of $1,519,117, the Examiner held that only 33.34% of tax accruals (totaling $1,106,901) should be credited and an allowance should be made for the new items which would produce [5] a working capital allowance of $1,914,708. Since the objective of the Staff's contention was apparently to wipe out the current allowance of $1,462,148, the effect of this finding was to demon-

---

5. The proper working capital allowance for the purposes of this decision was found by the Examiner to be:

| | |
|---|---|
| Working Capital other than | |
| Min. Bank Balances: | |
| *Materials and supplies | $1,074,506 |
| Gas purchase lag | 491,812 |
| *Operating expense lag | 485,711 |
| Prepayments | 138,713 |
| Total | $2,190,742 |

| | |
|---|---|
| Offset for Federal income tax accruals | 1,106,901 |
| Net | $1,083,841 |
| Minimum Bank Balances | $1,000,000 |
| Offsets (Taxes-Other) | 169,133 |
| Net | $ 830,867 |
| Resultant Allowances for Working Capital and Min. Bank Balances | $1,914,708 |

*Only components included in Trunkline's Rate Schedule P–1, subpar. 3.4(b), note 2, supra

strate that such relief ought not to be granted. The Examiner, on Trunkline's motion, accordingly dismissed the proceedings.

Since we hold that the parties have not had the full and adequate hearing and determination by the Commission of the merits of this matter as the statute requires, it would not be appropriate here for us to bypass the Commission, as it itself did, to determine whether these changes and the new items ought to have been allowed. We shall discuss them briefly only to indicate that there was, on the record, a substantial basis for the Examiner's conclusions and a sufficient showing to compel adjudication of them by the Commission.

For the two items currently allowed, note 2, *supra*, one was a slight reduction, the other, operating expense lag, represented an increase from $387,642 to $485,711. This difference stemmed from an allowance of a 55-day lag as compared to a 45-day lag (one-eighth of expenses, see Par. 3.4(b), note 1, supra). The Examiner reasoned that since Trunkline did not get paid for gas sold to Panhandle until the 25th of the month following the sale, but operating expenses were paid currently as they accrued, the money disbursed for expenses was out for that month plus 25 days of the next month until gas sales payment was received. The item of prepayments represented prepayments of insurance, lease rentals, telephone and communication lines, and the like.[6] The gas purchase lag allowance was based upon the admitted fact that under Trunkline's tariffs, it collects from Panhandle on the 25th of the succeeding month. Trunkline, on the other hand, under its contracts with producers, was required to pay for gas delivered to Trunkline by the 20th of the month. The Examiner, as a representative amount allowed $491,812 for this 5-day lag. Because Trunkline could not compel payment earlier than the 25th, the Examiner overruled the alternative contention of the Staff that this lag should be reduced by 2¾ days since Panhandle makes its payments to Trunkline on an average 2¾ days before the close of the period. Trunkline also sought $2,100,000 as minimum bank balances in New York and Houston banks, a million of which it urged was necessary to establish banker confidence enabling Trunkline to procure temporary interim or permanent financing at advantageous terms. Staff experts conceded that $750,000 would be a minimum reasonable bank account to be furnished by investors. The Examiner allowed $1,000,000 which was the customary balance in the Houston active bank account.

Thus, accepting the contention that some credit was properly due for tax accruals and finding on it that the proper amount should be $1,106,901, the Examiner held that no downward revision should be made since items properly includable, but not theretofore allowed, offset the tax credit by more than the current working capital allowance of $1,462,148.

But on the Staff's exceptions to the Examiner's report, only a superficial attack was made by the Staff on the merits of these allowances (increased or new items), that is, on the sufficiency of the evidence to sustain them or the legal propriety of their allowance. And if little was sought, even less was considered. For the Commission, other than passing incidentally on the question of using an *average* of tax accruals as compared to the maximum amount (33.34%) constantly available, ignored these matters altogether on the simple basis that they were beyond the scope of the issues.

Forthrightly recognizing that the exceptions concerning "gas purchase expense, operating expense lag, prepayments, and minimum bank balances * *

---

6. The Examiner stated: "In prior cases the Commission has allowed prepayments as a part of working capital" and appended to that a footnote reference to cases beginning with Matter of Chicago District Electric Generating Corporation, 2 FPC 412, 425 and ending with Matters of Michigan-Wisconsin Pipe Line Co., G–1678, 1954, Mimeo Op. No. 275, pp. 45, 64.

stem from the Examiner's treatment of these aspects of working capital * *," the Commission, as though Trunkline or the Examiner, or both, were on a radical course claiming that it would or could " * * * not depart from our standard and usual method of computing working capital" brushed all aside by the simple pronouncement "Our decision is limited to the question of the amount of tax accruals to be credited against working capital."

The Commission, neither in its opinion nor here by brief, attempts to justify this action as a legal right in an administrative body, once it sees a proceeding taking a turn which somehow runs counter to its self-determined policy, to change the rules in the middle of the game. Nor may, or does it, seek to justify it by the *terms* of the Order. On the contrary, by a sort of beguiling candor, National Rag & Waste Co. v. United States, 5 Cir., 237 F.2d 846, which highlights the silence indicating either a recognition that these contentions cannot be made or at least that no precedent can be marshaled in their behalf, it makes the frank statement: "The basis for our decision to limit the scope of this order is clear from the *context in which* the proceedings have arisen * * *."

With what is little more than a restatement of the recitals in the prefatory portion of the Order of June 15, 1955, the Commission then proceeded to reargue the general proposition that this had all come about because, in the initial rate proceeding of Panhandle, not Trunkline, the question of Trunkline's tax accruals had been purposely passed by. But now Panhandle's request for another $12,000,000 increase in rates had " * * * put in issue the question of deduction of tax accruals from Trunkline's gross working capital."

No doubt the context made the credit for Trunkline's tax accruals an issue. But the investigation did not come from the context. It came from the Order. The order in the simplest and most direct words charted the course of this proceed-

ing. It was in no sense limited to tax accruals. It encompassed all that had a genuine reasonable relationship to the working capital requirements of Trunkline. This not only reflected what the language used actually stated. It contained as well its own wisdom that a one-sided investigation to determine whether a specific item should be deleted might well suffer from congenital defects unless it presented an adequate opportunity for ascertaining whether, and to what extent, other matters might have to be reckoned with to assure a rate free from the charge of fundamental infirmity. On the record so far presented, this would be especially true where, as here, the failure to include, or failure of either party to insist upon the inclusion, of each of these items might have been an acquiescence recognizing that these items, partly or wholly, were, or might be, mutually offsetting.

The result is that the Commission must adjudicate this matter within the full framework fashioned by it. All of the matters urged by Trunkline and found by the Examiner were pertinent and the Commission was, and is, obligated to adjudicate and determine the matters presented by this proceeding.

As this adjudication has not yet been had, we do not further outline either the precise course or the results. The Commission did, however, undertake to review the question of tax accruals and the propriety of its specific action there is directly involved. The Commission, by categorical language, Par. 3.4(b) of the Rate Schedule, note 1, *supra*, prescribed a credit against the working capital allowance of "65.55% of the Federal income tax expense included in the cost of service billed to the Buyer [Panhandle] for the preceding 12-month period."

Of course, this result cannot stand for it was the product of a context which we hold to have been too constricted. Tax accruals was but one of the specific items comprising working capital. It must be judged in relation to that comprehensive problem. For if, to the extent that tax accruals do or do not provide current

funds with which to meet current expenses, the allowance for the other items must be increased or reduced accordingly.

The problem is not merely the academic one of the propriety of a credit for tax accruals under various legal precedents, note 3, supra, or the use of averages for fixing the amount. Neither is an end in itself. Each is legally permissible because in genuine substance the use of the particular average reasonably assures that the indicated percentage of the total accruals is reasonably available for the utility's current use. If the record does not reasonably substantiate that underlying fact conclusion, the credit in that amount may not stand. Undoubtedly because of this, the Commission itself recognizes that, "The amount of accruals, whether Federal income tax accruals or other accruals, which are available to offset working capital requirements must be determined in each case," Transcontinental Gas Pipe Line Corp., 11 FPC 94, 94 PUR NS 333, Op. 227. The object is neither the creation of a universal formula nor its mechanical application to all cases in all circumstances. The object is to ascertain working capital which, " * * * in the context of public utility rate regulation, has been defined as the 'allowance for the sum which the Company *needs to supply from its own funds* for the purpose of enabling it to meet its current obligations as they arise and to operate economically and efficiently'. Barnes, The Economics of Public Utility Regulation (1942), 495." Alabama-Tennessee Natural Gas Co. v. Federal Power Comm., 3 Cir., 203 F.2d 494, at page 498.

But here the Commission has thus far arbitrarily applied an arbitrary formula. It was applied without regard to a determination of the differences between a cost-of-service formula rate and one on a traditional rate base. It was applied without regard to the obvious fact that the so-called test period of 1955–1956–1957 is, and was known to be, completely unrealistic for 1957–1958 to 1960 and beyond as corporate income tax payment schedules change toward, and finally become, current.

As to the first, averages may be available for wider use in traditional rate base situations. For the highs and lows, the losses and gains, can or may average out. The losses of one month will be offset by the gains of the next. But on a cost-of-service formula, this is not possible. This difference must be evaluated.

On the second, the Commission adopted the Staff's contention for a representative arithmetical average of 65.55% based on the years 1955–1956–1957. In support of its reasonableness, its brief here points out that in the year 1956 the low point of 33.34% (the maximum continuously available under Trunkline's theory) will prevail only for ten days during the entire year, from June 15 to June 25 whereas from February 25 to March 15, 18 days, 91.38% will be available. But when these computations are carried forward (they vary solely because of the change in the schedule [7] of

---

7. The schedule of payment dates and percentages to be paid as accelerated payments of corporate income tax under 26 U.S.C.A. § 6154(a), 1954 Internal Revenue Code, is:

| Year of Payment | 3/15 | Past Year's Tax | | | Current Year's Tax | |
| | | 6/15 | 9/15 | 12/15 | 9/15 | 12/15 |
|---|---|---|---|---|---|---|
| 1954 | 45 | 45 | 5 | 5 | —— | —— |
| 1955 | 50 | 50 | —— | —— | 5 | 5 |
| 1956 | 45 | 45 | —— | —— | 10 | 10 |
| 1957 | 40 | 40 | —— | —— | 15 | 15 |
| 1958 | 35 | 35 | —— | —— | 20 | 20 |
| 1959 | 30 | 30 | —— | —— | 25 | 25 |
| 1960 | 25 | 25 | —— | —— | 25 | 25 |

corporate income tax payments and are in no way affected by fluctuations in earnings, income expenses, etc.), the very same formula loses all resemblance to fact.

In 1957 there are more than 200 days during which the amount of tax accruals assumed by the Commission's average (65.55%) are simply not available.[8] In 1958 the figure exceeds 250 days, in 1959

8. The undisputed amounts available for use month by month during 1955 to 1960 for each $10,000 unit of annual income tax accruals is shown by Trunkline's Exhibit 14:

## TRUNKLINE GAS COMPANY

Computation of Maximum Amount of Federal Income Tax Accruals Which is Constantly in Custody of Company

| 1955 | | 1955 Tax Accruals Collected | 1955 Tax Payments | 1955 Cumulative Accruals | 1956 Tax Accruals Collected | 1956 Tax Payments | 1956 Cumulative Accruals | 1957 Tax Accruals Collected | 1957 Tax Payments | 1957 Cumulative Accruals |
|---|---|---|---|---|---|---|---|---|---|---|
| (Balance forward) | | | | | | | $8,167 | | | $7,167 |
| January | 25 | | | | $ 833 | | 9,000 | $ 833 | | 8,000 |
| February | 25 | $ 833 | | $ 833 | 833 | | 9,833 | 833 | | 8,833 |
| March | 15 | | | | | $ 4,500 | 5,333 | | $ 4,000 | 4,833 |
| March | 25 | 834 | | 1,667 | 834 | | 6,167 | 834 | | 5,667 |
| April | 25 | 834 | | 2,501 | 834 | | 7,001 | 834 | | 6,501 |
| May | 25 | 833 | | 3,334* | 833 | | 7,834 | 833 | | 7,334 |
| June | 15 | | | | | 4,500 | 3,334* | | 4,000 | 3,334* |
| June | 25 | 833 | | 4,167 | 833 | | 4,167 | 833 | | 4,167 |
| July | 25 | 834 | | 5,001 | 834 | | 5,001 | 834 | | 5,001 |
| August | 25 | 834 | | 5,835 | 834 | | 5,835 | 834 | | 5,835 |
| September | 15 | | $ 500 | | | 1,000 | 4,835 | | 1,500 | 4,335 |
| September | 25 | 833 | | 6,168 | 833 | | 5,668 | 833 | | 5,168 |
| October | 25 | 833 | | 7,001 | 833 | | 6,501 | 833 | | 6,001 |
| November | 25 | 833 | | 7,834 | 833 | | 7,334 | 833 | | 6,834 |
| December | 15 | | 500 | 7,334 | | 1,000 | 6,334 | | 1,500 | 5,334 |
| December | 25 | 833 | | 8,167 | 833 | | 7,167 | 833 | | 6,167 |
| Total | | $ 9,167 | $ 1,000 | | $10,000 | $11,000 | | $10,000 | $11,000 | |

there are only 15 days, and by the following year, 1960, there are no days in the entire year on which Trunkline would have on hand the so-called "average" tax accruals.

We do not mean to fashion ourselves an artificial arbitrary restriction on the use of averages by the Commission. It is not doing this to insist that for a business whose very operations envisage con-

| | 1958 | | | 1959 | | | 1960 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Tax Accruals Collected | Tax Payments | Cumulative Accruals | Tax Accruals Collected | Tax Payments | Cumulative Accruals | Tax Accruals Collected | Tax Payments | Cumulative Accruals |
| January 25 | $ 833 | | $6,167 | $ 833 | | $5,167 | $ 833 | | $4,167 |
| February 25 | 833 | | 7,000 | 833 | | 6,000 | 833 | | 5,000 |
| March 15 | | $ 3,500 | 7,833 | | $ 3,000 | 6,833 | | $ 2,500 | 5,833 |
| March 25 | 834 | | 4,333 | 834 | | 3,833 | 834 | | 3,333* |
| April 25 | 834 | | 5,167 | 834 | | 4,667 | 834 | | 4,167 |
| May 25 | 833 | | 6,001 | 833 | | 5,501 | 833 | | 5,001 |
| June 15 | | 3,500 | 6,834 | | 3,000 | 6,334 | | 2,500 | 5,834 |
| June 25 | 833 | | 3,334* | 833 | | 3,334* | 833 | | 3,334* |
| July 25 | 834 | | 4,167 | 834 | | 4,167 | 834 | | 4,167 |
| August 25 | 834 | | 5,001 | 834 | | 5,001 | 834 | | 5,001 |
| September 15 | | 2,000 | 5,835 | | 2,500 | 5,835 | | 2,500 | 5,835 |
| September 25 | 833 | | 3,835 | 833 | | 3,335* | 833 | | 3,335* |
| October 25 | 833 | | 4,668 | 833 | | 4,168 | 833 | | 4,168 |
| November 25 | 833 | | 5,501 | 833 | | 5,001 | 833 | | 5,001 |
| December 15 | | 2,000 | 6,334 | | 2,500 | 5,834 | | 2,500 | 5,834 |
| December 25 | 833 | | 4,334* | 833 | | 3,334* | 833 | | 3,334* |
| Total | $10,000 | $11,000 | 5,167 | $10,000 | $11,000 | 4,167 | $10,000 | $10,000 | 4,167 |

* Represents 33⅓% of assumed annual provision for actual Federal income taxes ($10,000)

The average available for each year (Exhibit 2) is:

| | |
|---|---|
| 1954 | 77.22% |
| 1955 | 70.5 % |
| 1956 | 65.55% |
| 1957 | 60.55% |
| 1958 | 55.55% |
| 1959 | 50.55% |
| 1960 | 47.22% |

tinued activity for a minimum period of six years (1955 through 1960), the Commission must weigh the average or adjust it in some suitable way to give real recognition to the factors either known or reasonably probable.

As it now stands, by an arithmetical average that flies in the face of actual fact, the Commission assumes that the specified "average" funds (65.55%) will be on hand. The credit is allowed only because the funds are reasonably available. If they are not reasonably available in the amounts fixed by the percentage, then the utility has to supply its own investor funds on which it is entitled to a return. It can only use funds on hand. It cannot use averages. If, as in the case of 1957, note 8, *supra*, it has sums ranging from $7,167 to $8,833 available January 1 up through March 15, but from June 15 to November 24, the accruals run from $3,334 to $6,001, what is to be used for current purchases during those four months? In 1958 with accruals from $7,000 to $7,833 January 1 through March 15 and $6,834 for the short period of May 25 to June 25, where are the current funds to come from for the six remaining months of the year when the tax accruals run the gamut from 33% to 41% to 55% to 63%?

A "surplus" of tax accruals in one month is not by a mere process of averaging available for the "lean" months later on. The assumption is that the operating expenses are relatively constant so the surplus can hardly be used to prepay them. It is available for such short periods that if invested, the return on it would nowhere make up the amounts needed later on. It is no answer to say that in the lean months the utility can get short-term loans. For that is precisely what would be needed. And if needed because tax accruals have not been adequate, this establishes that it would be necessary to supply additional working capital.

Consequently, when a tax accrual credit is fixed, it must bear a reasonably substantial actual relationship to the funds available for use in meeting cur-

rent operations. The conclusion of the Commission that the 65.55% allowance achieved this was, on the record thus far, without substantial basis and is not in accordance with law and must accordingly be set aside. Administrative Procedure Act, 5 U.S.C.A. § 1009(e).

The Order appealed from is set aside and the cause is remanded to the Commission for further and not inconsistent proceedings.

Reversed and remanded.