R.P. PORTER INTERNATIONAL, Inc., Plaintiff

v.

PACIFIC INTERNATIONAL ENGINEERING, Ltd., Defendant

High Court of American Samoa
Trial Division

CA No. 117-88

June 19, 1989

Before REES, Associate Justice, OLO, Associate Judge, and MATA'UTIA, Associate Judge

Counsel: For Plaintiff, Charles Ala'ilima
 For Defendant, Steven H. Watson

Plaintiff and defendant are both closely held corporations. Plaintiff corporation is owned and operated by Robert Porter and defendant corporation by Warren Fisher. Prior to the incidents that gave rise to the present action Porter and Fisher had enjoyed a close and friendly business relationship. Each was the principal witness for his company at trial.

Porter claims that Fisher agreed to purchase $30,000 worth of aggregate (crushed rock); that Fisher received 612 cubic yards of aggregate before wrongfully terminating the contract; and that Fisher's company still owes $5602 on the purchase price of the aggregate it received.

Part of the amount claimed by Porter is for aggregate said to have been received by Fisher in excess of the amount reflected by Porter's invoices. The invoices are said to have understated the amount because Fisher had misrepresented the size of the dump trucks in which his company hauled the aggregate. Fisher told Porter that each of his trucks holds seven cubic yards, whereas Porter says he later discovered that the two trucks hold 7.8 and 9.07 cubic yards respectively.

Fisher counterclaims for damages said to have been suffered by Porter's failure to perform his contractual obligations. His story is that Porter never delivered the amount of aggregate he had promised to deliver, and that it therefore became necessary to make the aggregate out of cinders. Although cinders are substantially less expensive than crushed rock, Fisher says the costs of processing make the cinder aggregate more expensive than crushed rock aggregate. Fisher claims his company was damaged in the amount of $27,287.36 by Porter's failure to deliver the promised rock. He also claims that Porter's company breached its obligation to load the aggregate onto Fisher's trucks and that Fisher was thereby injured by having to use his own loader. Fisher further

contends, contrary to Porter, that neither of his dump trucks holds more than seven cubic yards.

Each of the two principal witnesses attempted to convince the Court that the other could not be trusted. Both were in some measure successful. Each man testified to specific and detailed conversations of which the other professed to have no recollection. Porter said Fisher had left his loading machine on Porter's lot for his own convenience for some months, whereas Fisher said the loader had been specially diverted from other important but unspecified tasks because of Porter's inability to fulfil his obligation to load the aggregate. Porter was shown to have altered invoices so as to bill Fisher for aggregate in amounts greater than those Porter's employees had certified as the amounts Fisher had picked up. (These alterations happened before Porter claims to have discovered the alleged excess capacity of Fisher's trucks.) Fisher submitted what the Court finds to be a grossly misleading estimate of what it cost him to process the cinders he ultimately used instead of Porter's crushed rock. Each side attempted to portray an incident early in the contractual relationship, wherein it seems to have been contemplated to bill Fisher's customer (the American Samoa Government) for aggregate that had not yet been produced by Porter, as the suggestion of the other.

I. Facts

Because each party relied heavily on the largely uncorroborated testimony of its owner/operator, and because the Court finds the testimony of these two witnesses to be about equally believable, neither side succeeded in proving very much of its case. We find the material facts to be as follows:

1) The parties did have a contract whereby plaintiff (hereinafter, for convenience, Porter) was to supply defendant (hereinafter Fisher) with 1500 cubic yards of crushed rock at a price of $30,000. Delivery was to be "F.O.B. our [Porter's] plant at Tafuna." Porter was to "start stockpiling by April 4, 1988" an initial quantity of 1000 yards. The parties did not agree on a date by which any particular amount had to be delivered. Fisher made an advance payment of $500.

2) Neither side was initially in a great hurry. Porter did stockpile an unspecified quantity of rock within a few weeks, but Fisher had experienced some unrelated delays in his contract with the government, took a trip off-island for a few weeks, and did not attempt to pick up any rock until mid-June. By then Porter had sold some of the stockpiled rock to other customers.

3) Between June and September Fisher picked up 462 cubic yards of rock from Porter. Throughout this time Porter was experiencing problems with his rock-crushing machine and was under pressure from other customers to supply them with rock. Consequently, he did not always supply Fisher with rock at such times and in such quantities as Fisher desired.

4) The figure of 462 yards for the aggregate received by Fisher is based on the records made by Porter's employees at the time of each delivery. These records reflect that some of the loads picked up by Fisher's trucks were partial rather than full truck loads. Porter's revised estimate of 483 yards, reflected in the invoices he sent to Fisher, was based on the assumption that all loads received by Fisher were in fact full loads. This assumption is not supported by the preponderance of the evidence.

5) On September 21, 1988, Porter yet again revised his estimate of the size of each load. The new estimate --- 9.02 cubic yards for one truck, 7.8 for the other --- was based on the assumption that each load was "heaped up to (4) four feet in the middle" --- about two feet higher than the side panels placed around the bed of the truck to prevent spillage.

6) Meanwhile, on September 20, Fisher wrote a letter to the effect that he viewed the amount of rock thus far delivered to be insufficient to "honor [Porter's] contract obligation." The letter added that if Porter would be "unable to do so [i.e., to produce an unspecified but presumably greater amount of crushed rock] by September 23rd we will be forced to look to alternative sources in order to meet our construction schedule." Neither this letter nor Porter's September 21 letter appears to have been a response to the other; the two letters apparently crossed in the mail.

7) Fisher's September 21 letter also stated that Porter's company had "failed to meet [its] F.O.B. obligations." This was a reference to the fact that the aggregate had been loaded onto Fisher's trucks by Fisher's own loading machine. Fisher estimated that his "actual loading costs" were $2.50 per cubic yard. He also claimed to have incurred $581.25 in "truck standby time" ($46^{1}/_{2}$ hours at $12.50 per hour) and "loader standby time" of $10,043.25 (105 days at $95.65 per day).

8) It appears that Fisher had been seeking an alternative source of aggregate prior to the September 20 and 21 letters. On September 27 he sought and received the approval of the government's project engineer for the use of cinders rather than crushed rock on most of the project. Fisher did use the crushed rock aggregate obtained from Porter for certain parts of the project. At the time of trial the project had not yet been completed --- Fisher's deadline having been extended for reasons not shown to have been related to Porter's failure to deliver more aggregate --- and Fisher still had a substantial supply of the crushed rock on hand.

9) Fisher claims that the cinder aggregate he has used in place of the undelivered crushed rock has cost him $31,363.77 so far and will cost him an additional $25,923.59 by the time the project is completed, for a total of $57,287.36. (The cost of the 1038 cubic yards of crushed rock for which these cinders are a replacement would have been $20,760.)

By far the largest element in Fisher's estimate of the cost of the cinder aggregate--- about $40,000 of the $57,000 total --- is a claim for the use of two machines belonging to Fisher himself. He says that these two machines are necessary to screen the cinders; that the fair market value of the machines is $125 per hour and $58.50 per hour respectively; that he has used the two machines for 125 hours in screening 562 cubic yards of aggregate so far; and that he has 476 cubic yards left to screen, which will take about 105 additional hours.

Porter vigorously contests Fisher's estimate of the number of hours it takes to screen cinders. Moreover, it appears that the hourly rates on which Fisher relies are what he believes he would get if

128

he rented the machines to people. Assuming the $125 and $58.50 figures to be accurate estimates of "market value," they appear nevertheless to include a substantial profit to Fisher. Fisher did not show that he lost revenue from any particular projects or would-be customers during the 125 hours he allegedly used the machines to screen cinders. He did not even show that the machines were generally in profitable use. The actual injury to him resulting from any breach by Porter, therefore, was limited to the actual cost of operating the machines: the $5 per hour or so he paid his operators and the cost of fuel and of actual depreciation (i.e., "wear and tear" actually incurred from the incremental use rather than a pro-rated figure adopted for tax purposes) of the machines. Fisher presented no evidence of the cost of fuel or depreciation. On the present record we conclude that his actual operating costs were far lower than the quoted hourly rates. Since the cinders themselves cost substantially less than crushed rock, Fisher has not shown that he was damaged --- indeed, he may well have profited--- by the substitution.

10) The record reflects that Fisher paid Porter $7225 prior to the termination of the contractual relationship. At the contract price of $20, the 462 cubic yards delivered would have cost $9240. Porter also supplied other items to Fisher at a cost of $575. The remaining amount due on the contract price of the 462 yards of crushed rock, therefore, was $2590.

## II. Wrongful Termination of the Contract

From these facts we conclude that neither party carried its burden of proving that the other party breached the contract, except that (1) Porter did not load the aggregate onto Fisher's trucks as he should have done and (2) Fisher still owes Porter part of the purchase price of the aggregate that was delivered.

Porter delivered 462 yards of aggregate, or about one-third of the total due under the contract, within 90 days of Fisher's first indication that he was ready to accept any aggregate at all. This rate of delivery did not violate any express term of the contract. Nor was there any evidence to suggest that the delivery of 462 cubic yards by September, rather than some

129

larger amount, was a breach of an implied term of the contract. Although every contracting party has an obligation to deal reasonably with the other, Fisher did not prove a breach of this obligation. He might have been able to do this, even in the absence of any specific reference in the written contract to a date of delivery, by showing that Porter knew or should have known of deadlines imposed on Fisher under his construction contract with the government. No such showing was made. Indeed, at the time of trial in May 1989 Fisher's contract with the government did not appear to be near completion, the deadline having been extended on account of delays that were apparently unrelated to the present controversy, and no penalties had been imposed on Fisher by the government. If Porter had continued to supply aggregate to Fisher at the rate he had been supplying it before Fisher chose to terminate the contract, the whole 1500 yards would have been supplied by March 1989. From the evidence before us we cannot conclude that complete performance by that date would have violated the contract.

In any case, Fisher has not proved that his company was damaged by Porter's failure to deliver more crushed rock. The cinders with which they replaced the crushed rock cost them $6 per cubic yard rather than $20. The only credible evidence Fisher presented of the cost to him of screening the cinders was $5 per hour for machine operators. Even on the generous assumptions that fuel and actual depreciation will cost him an additional $20 per hour per machine, and that it will really take him about 230 hours to screen all the cinders, and that he will really need to buy 2000 cubic yards of cinders in order to produce 1000 usable yards, the cinder aggregate would cost him roughly what the crushed rock aggregate would have cost.

Fisher himself may have breached the contract by refusing to accept further aggregate from Porter after September 21. It appears, however, that Porter acquiesced in the termination. The only damages claimed or proved by Porter were for the unpaid purchase price of the crushed rock that was actually delivered. We find that Fisher does owe Porter $2590, the unpaid balance of the purchase price.

## III. "Free on Board"

With regard to the loading of the crushed rock, Porter had the burden of proving that F.O.B. had any meaning other than the usual one, which is that the seller is obliged to load the goods "free on board" the conveyance by which they will be transported to the buyer. See, e.g., Alfred Hofmann & Co. v. United States, 329 F.2d 657 (Ct. Cl. 1964); Stalik v. United States, 247 F.2d 162 F. Supp. 652 (10th Cir. 1957). Despite trial testimony to the effect that f.o.b. means "freight on board" and has only to do with the risk of loss, this burden was not met. Fisher insists that he never, by word or deed, gave Porter any reason to believe that his failure to supply equipment for loading the aggregate was excused; Porter insists otherwise; the Court regards the two witnesses as equally credible; and the burden of proof was on Porter. Accordingly, we find that Porter did breach the contract in this respect.

The burden of proving injury on account of this breach was on Fisher. He did not prove that his own loader was diverted from other profitable uses by its employment in loading Porter's aggregate, so he is not entitled to compensation for "standby time." His estimate of $2.50 per cubic yard as the cost of operating the loader, however, does not seem unreasonable in light of the contract price and of Porter's admission that delivery costs are a substantial factor in the price of aggregate. Accordingly, Fisher is entitled to an offset of $1155 (462 x $2.50) against the unpaid balance of the purchase price.

## IV. Excess Loads

Finally, Porter claims that he unknowingly delivered Fisher about 129.6 additional cubic yards of aggregate because Fisher's original estimate of seven cubic yards per truck load was too low. Porter did prove, by means of a photographic demonstration, that one of the trucks could hold about nine cubic yards when the load was tamped down manually and was piled about two feet higher than the truck's side panels. Fisher claimed that the loads actually delivered to him by Porter were not tamped down so firmly and therefore contained fewer cubic yards than Porter's demonstration load.

131

The difference is immaterial. Any load as high as that depicted in Porter's photographs would have been in clear violation of A.S.C.A. § 22.0331, which provides in pertinent part that *no vehicle may be driven or moved on any highway when any load thereon is not entirely within the body of the vehicle, unless the load is securely fastened by "clamps, ropes, straps, cargo nets, or other suitable mechanical devices"* to prevent it from dropping or shifting. Although the parties apparently regard this prohibition as technical and unimportant, the Court does not so regard it and does not believe that the Fono so intended it.

The transportation of any load of over seven cubic yards on either of Fisher's trucks would have broken a law enacted to protect innocent bystanders from being hit by rocks. We decline to trivialize this protection by redressing the failure of one contracting party to compensate another for assisting in its infringement.

### V. Conclusion and Order

Damages in the amount of $1435 are assessed against the defendant in favor of the plaintiff. All other claims by plaintiff and defendant are dismissed.

It is so ordered.