The Narragansett Electric Company *vs.* Thomas A. Kennelly, *Public Utility Adm'r.*

JULY 7, 1958.

PRESENT: Condon, C.J., Roberts, Andrews and Paolino, JJ.

58

CONDON, C. J. This is an appeal by The Narragansett Electric Company from certain orders of the public utility administrator with reference to the company's tariffs of re-

vised rates and charges for electric and gas service which it filed on November 23, 1956. In accordance with general laws 1956, §39-3-11, the administrator suspended the taking effect of such tariffs and ordered a public hearing to investigate and determine their propriety.

At such hearing the company relied upon the testimony of several of its officers and certain independent experts in support of its need for increased rates. It attributed such need principally to inflation. To compensate therefor it suggested that the administrator in determining the reasonableness of the proposed rates should first determine the fair value of its property by using a so-called trended original cost formula based on the Handy-Whitman Index. Its experts testified along that line generally and explained how the application of such formula would produce a reasonably accurate approximation of the value of the company's property as a rate base.

The people officially represented by public counsel, the United States, the state of Rhode Island, the city of Providence, certain other municipalities in the company's service area, and a group of thirty-five electors appeared in opposition to the company's revised tariffs. In substance they claimed that the company's existing rates were lawful and reasonable and therefore the company was not entitled to any increase thereof. And they further contended that by adopting the formula of original cost less depreciation in determining the company's rate base the administrator would find that those rates were presently yielding such a return on the company's property used and useful in the public service.

The hearing began on February 18, 1957 and was finally concluded on September 20, 1957. During that period there were intervals when no sessions were held. This apparently afforded the administrator an opportunity while the hearing was still in progress to weigh and consider the testimony of the experts, and also to study the numerous ex-

hibits which were introduced to illustrate such testimony. Consequently on September 30, 1957 he filed his decision and orders consisting of sixty-eight typewritten pages wherein he reviewed the evidence and gave his reasons for relying upon the opinions of certain expert witnesses and rejecting the opinions of other experts. The orders read as follows:

"(7165) Ordered: That the proposed new electric tariffs filed by The Narragansett Electric Company with the office of the Public Utility Administrator on November 23, 1956 be and the same are hereby denied and dismissed; and it is further

(7166) Ordered: That the four gas tariffs filed by The Narragansett Electric Company with the Administrator's office on November 23, 1956 and designated as R.I.P.U.A. No. 318, R.I.P.U.A. No. 319, R.I.P.U.A. No. 320, and R.I.P.U.A. No. 321 be and the same are hereby allowed to become effective forthwith; provided, however, that the Purchased Gas Price Adjustment Clause contained therein and the provision for Bi-Monthly billing contained therein be deleted and excluded from the aforementioned four gas tariffs; and it is further

Ordered: That within sixty (60) days from the date of this order The Narragansett Electric Company shall file a revised uniform fuel adjustment clause for the Administrator's consideration, said fuel clause to be applied only to those rates upon which there is presently an existing fuel clause; and said fuel clause shall contain a base cost of fuel which reflects the average fuel costs incurred during the year 1956 and an efficiency factor which will reflect the economies of generation experienced during the last calendar year, and permission is hereby granted to The Narragansett Electric Company to revise the block rates in those tariffs containing a fuel clause in a manner that will not increase the Company's level of revenue based on the test year of 1956; and it is further

Ordered: That The Narragansett Electric Company shall submit detailed calculations to demonstrate that

the revised block rates, together with the proposed unified fuel clause, will not increase the level of revenue actually obtained from these tariffs during the year 1956."

The company's reasons of appeal from those orders are 121 in number, but in briefing its appeal for hearing in this court it has compressed them into two basic issues under which it has argued thirteen subsidiary questions. Such basic issues are as follows: "1. Do the Decision and Orders of the Administrator of September 30, 1957, fix rates which are unlawful or unreasonable within the meaning of the provisions of General Laws of 1938, Chapter 122, as amended by Public Laws of 1949, Chapter 2174? 2. Do the Decision and Orders of the Administrator of September 30, 1957, violate rights of your Petitioner arising under the Constitution of the State of Rhode Island and by the Constitution of the United States?"

By way of answering the subsidiary questions the company makes the following contentions. In determining the rate base the administrator erred (1) in adopting a book cost rate and ignoring uncontradicted evidence of fair value; (2) in determining such base by averaging the amount at the beginning and the amount at the end of the company's test year 1956; (3) in excluding therefrom the electric plant acquisition adjustment account (Account 100.5); (4) in failing to include a sufficient sum for cash working capital; (5) in excluding unfinished construction; and (6) in deducting from book cost an estimated depreciation reserve requirement rather than the company's book depreciation reserve.

He also committed reversible error, the company contends, (7) in rejecting its method for separating its intrastate and interstate operations; (8) in the method he adopted for determining a fair rate of return; (9) in denying and dismissing the company's plan for simplifying its rate structure; (10) in his conclusions with reference to

the fuel adjustment clause in the electric rates; (11) in failing either to approve or disapprove the gas price adjustment clause; (12) in disapproving bimonthly billing in the proposed electric and gas rate schedules; and (13) in certain rulings admitting or excluding evidence which rulings prejudiced the company by depriving it of certain constitutional rights.

It appears from the evidence that the company was incorporated by a special legislative act on April 8, 1926 as the United Electric Power Company. On April 14, 1927 its name was changed by another act to The Narragansett Electric Company. Under those acts it was authorized to acquire all of the assets of The Narragansett Electric Lighting Company. On June 13, 1927 it filed a petition with the public utilities commission, the predecessor of the public utility administrator, for approval of an issue of bonds and stocks for the purpose of acquiring such assets. After a hearing the commission granted the petition on the understanding that the capitalization of the company would not exceed expenditures *prudently made* for the acquisition of the old Narragansett Electric Lighting Company. For that purpose the commission considered cost of reproduction new less depreciation of such company's property and adopted a valuation which was in effect a compromise of the amount represented by the company's appraisal and the amount of the state's appraisal.

It appears that a sum approximately $20,000,000 in excess of the original cost of the old lighting company's assets was paid for the acquisition. This excess was entered in an acquisition account in the new company's books. Later the balance of this account was segregated in Account 100.5 by order of the Federal Power Commission and is referred to herein as the Electric Plant Acquisition Adjustment Account. The balance of this account on the company's books for the test year 1956 was approximately $1,700,000. The company contended that such balance was properly includ-

able in the rate base, but the administrator expressly rejected that contention.

Since the company acquired the old lighting company in 1927 its business has grown considerably. In 1956 it served 196,000 electric customers and 6,700 gas customers. In 1926 the old company had only 102,000 customers. The service area now comprises all of the city of Providence and the major portion of the state outside that city. As a result of improvements in the art and increased efficiency in the conduct of its business the company since 1930 has made reductions in rates in the aggregate annually of $2,660,000.

For example, it was testified by the company's vice president and general manager Ralph E. Nock that it is obtaining twice as many kilowatts from a pound of coal as it obtained thirty years ago, that there were also substantial savings made because of heavier kilowatt loads, and that there were other savings from improvements in distribution and also from greater use of electricity as the result of promotional activities. He further testified that those were some of the principal factors that made possible its delay in seeking increased rates, but now the company was approaching a "point of diminishing returns" and therefore it needed an increase to cope with increased costs due to inflation. For such reason it filed the pending revised tariffs which thus represent the company's first formal request for increased rates. The proposed rates will, it expects, produce an increase in revenues of about $2,600,000 annually.

The company besides serving customers within its service area also sells electric power to other companies, some of which are outside the state. It thus does a substantial interstate as well as intrastate business. A number of such out-of-state companies are affiliates of the New England Electric System which owns all the common stock of The Narragansett Electric Company. That System through stock ownership controls the New England Power Com-

pany, the Attleboro Electric Company and the Mystic Power Company, with which companies The Narragansett Electric Company has subsisting contracts for the sale of power. This phase of the company's operations will be discussed in more detail when we consider its contentions with reference to the proper method of separating interstate from intrastate revenues in determining the rate base for intrastate business.

Under its first contention the company argues that the administrator erred in using the book cost formula, that is, actual original cost less depreciation, in determining the fair value of its property. It also argues that he erred in giving no weight to its evidence in support of the use of a so-called *trended* original cost formula for such purpose. That formula, it claims, must be given predominant weight in the determination of fair value when price levels have so materially changed as at present. The failure of the administrator to give it such weight in the instant case, it contends, has resulted in the taking of its property for public use without just compensation in violation of article I, sec. 16, of the state constitution.

In our opinion those contentions are without merit. There is no statute in this state and no decision of this court which requires the public utility administrator to use any particular method in determining the fair value of the property of a public utility for rate-making purposes. Under ,G. L. 1956, §39-2-1, he is charged with the duty of determining whether proposed rates are "reasonable and just" and in order to discharge that duty he should determine what is the fair value of the utility's property used and useful in the public service.

The company is mistaken in its contention that this court in *Public Utilities Comm'n* v. *East Providence Water Co.*, 48 R. I. 376, has established the precedent that the present fair value rule as defined in *Smyth* v. *Ames,* 169 U. S. 466, is the measure of the rate base. That rule has

been subjected to severe criticism even within the supreme court itself and has been referred to by one justice thereof in *Federal Power Comm'n* v. *Hope Natural Gas Co.*, 320 U. S. 591, 627, as a "hodge-podge." In that case the court decided that whether a rate order is lawful is to be judicially determined not necessarily by the particular method used in computing the rate base but whether the total impact of the order is just and reasonable. The court said at page 602: "It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important."

However, in 1927 when we decided the *East Providence Water Co.* case the *Smyth* v. *Ames* rule for measuring the rate base was still in good standing and it was adverted to by us as a method which the United States Supreme Court had approved. But the rule itself was referred to more for the purpose of supporting our holding that a first step in determining whether a proposed rate was just and reasonable was the determination of the fair value of the water company's property as a rate base. We did not therein specifically prescribe the use of any particular method for arriving at such determination. In this connection we stated at page 380: "In all proceedings for the determination of what is a fair and reasonable rate, the value of the property of the utility which it necessarily employs in rendering the service is the rate base and constitutes a matter of vital consideration." That is a holding that the fair value of the property is the rate base but it is not a rule prescribing how such value shall be determined.

The company also cites *Town of Jamestown* v. *Kennelly*, 81 R. I. 177, 181, and quotes the following language therefrom as indicative of our adoption of the fair value rule: "We do not accept its [the town's] view that the alleged

cost price of the property to the company in the sum of $95,000 on May 23, 1940 must necessarily be the original cost for rate-making purposes. The actual price paid may or may not have represented the fair value of the property. It is a relevant fact but not an exclusive or final test of such value."

In order to evaluate the significance of that statement it should not be read out of context. In that case the administrator had found from conflicting evidence as to original cost a rate base much greater than $95,000. The Town of Jamestown appealed and contended that such amount less certain adjustments was the true original cost. It was in answer to that contention we made the above statement. There was a conflict in the evidence and the administrator had to determine what was the original cost for rate-making purposes, not whether he should use the original cost formula or some other rule in making such determination. That case obviously does not support the company's contention here.

The company has also cited *Town of Narragansett* v. *Kennelly*, 83 R. I. 191. We find nothing in that case which lends any support to the company's contention. Of course, we held there as we did in the *East Providence Water Co.* case that the base for rate-making purposes is the value of the property used or useful in the public service, but we did not hold that the administrator was required to use any particular formula in determining such value.

However, the company cites numerous cases from other jurisdictions which support its contentions. We are not concerned with such cases unless they are holdings of the United States Supreme Court. None of the cases cited is from that court since its decision in the *Hope Natural Gas Co.* case. If and when that court holds that observance of the rule the company contends for is necessary to due process under the fourteenth amendment to the federal constitution we shall be compelled to acquiesce and require

the administrator to conform. However, from the tenor of the opinions in the *Hope Natural Gas Co.* case including those of Jackson and Frankfurter, JJ., dissenting on other grounds, such a holding in the foreseeable future is most unlikely.

It should be noted that in determining the rate base in the *Hope* case the commission adopted the actual legitimate cost theory, which is practically the same as actual original cost less depreciation. The court of appeals reversed their decision on the ground among others that they had used the wrong theory and that they should have used reproduction cost and *trended* original cost. In reversing the court of appeals the supreme court, without expressly approving any particular formula, held at page 602 that it was error to require the commission to follow "any single formula or combination of formulae * * *." Mr. Justice Jackson in his dissenting opinion in which he was joined by Mr. Justice Frankfurter concurred with the majority on this point, and at page 628 said with emphasis: "Certainly the theory of the court below that ties rate-making to the fair-value-reproduction-cost formula should be overruled as in conflict with *Federal Power Commission* v. *Natural Gas Pipeline Co.* [315 U. S. 575]" See also *Driscoll* v. *Edison Light & Power Co.,* 307 U. S. 104, 122.

Thus neither from the viewpoint of this court nor from the viewpoint of the United States Supreme Court was the administrator in the instant case required to use a particular formula in determining the company's rate base. The fact that, after weighing all the evidence, he decided to use the original cost less accrued depreciation formula, otherwise referred to as book cost, did not constitute a violation of the provisions of either the federal or state constitutions guaranteeing the company against the taking of its property for public use without just compensation or without due process of law. It is the end result of the administrator's order that must conform to those guaranties. If the rate

72

of return, judicially considered, is nonconfiscatory those constitutional requirements have been met and there is nothing more for the court to do but uphold the order regardless of the formula he used in establishing the rate base. As the United States Supreme Court said in the *Hope Natural Gas Co.* case, if the rate order is found not to be unjust and unreasonable judicial inquiry is at an end.

The company's next contention is that the administrator in using the book cost method was bound to calculate the rate base as of the end of the test year and therefore that he erred in averaging it at the beginning and end of that year. There was testimony from one of the public's experts that "It was the plant actually in use throughout the year which provided the service actually rendered during the year from which the revenues were derived. * * * I know of no facts which will indicate that such relationship would not continue in the future, which would warrant the use of a year-end rate base. To use a year-end rate base would cause distortion and introduce speculation into the rate determination process." In the absence of any contradictory expert testimony on this point the administrator adopted the principle that "there should be a matching of income earned during the period with the average plant in service during the same period." In the circumstances he was, in our opinion, justified in relying upon such expert opinion, especially where as here the expert expressly states the reasons for his judgment. In any event the administrator's conclusion, grounded as it is upon substantial evidence, will not be disturbed by this court unless it violates constitutional rights. *Town of Charlestown* v. *Kennelly*, 80 R. I. 148; *Town of Middletown* v. *Newport Water Corp.*, 53 R. I. 435.

However, the company contends further that because the administrator in previous rate cases has used "an end-of-period rate base" he was bound to do so in this case or the company would thus be denied the equal protection of the

law guaranteed to it by the fourteenth amendment to the federal constitution. There is no merit in such contention. The administrator had the duty of determining what was a just and reasonable rate base on the facts in evidence here. To require him arbitrarily to follow a course which had been followed in some other case or cases on different facts would place him in a constitutional vise that would deprive him of the freedom to decide what was a just and reasonable rate base on the facts in evidence before him. That freedom is important and indeed necessary to do justice in each case.

The company's third contention is that the administrator erred in excluding from the rate base the electric plant acquisition adjustment account otherwise referred to as Account 100.5. It argues that such account represented prudent investment by virtue of the order of the public utilities commission in 1927 wherein the commission approved the expenditure made for the acquisition of The Narragansett Electric Lighting Company. In our opinion such order cannot be properly deemed the inclusion of that account in the new company's rate base in a proceeding for the purpose of determining the reasonableness of its rates. Apparently that process had never been formally invoked by the company until the instant case. In the circumstances we think that the administrator was free to determine whether such account was properly includable in the rate base without regard to the prior order of the commission and without his passing judgment upon or reviewing such prior order.

On the evidence before him he found that the company "has not made any showing that the unamortized acquisition adjustment represents any tangible or intangible benefit to the consumer." In our opinion there was evidence to support such finding and no substantial evidence to the contrary aside from the company's claim based on the order of the public utilities commission. There is authority for

excluding accounts of this nature from the rate base as a matter of law. *Harrisburg Steel Corp.* v. *Pennsylvania Public Utility Comm'n,* 176 Pa. Super. 550. There the court said at page 556: "The amount paid by the Company in acquiring the utilities, even if it be assumed that the transactions were at arms length, cannot be adopted as original cost for rate making purposes. Original cost is such cost 'when first devoted to public service' * * * and cannot be construed to mean a larger amount which a new owner is obliged to pay on purchase of the property of a utility." Obviously in the case at bar there is no merit in the company's contention that the administrator's exclusion of such an account from its rate base was a confiscation of its property in violation of the due process clause of the fourteenth amendment to the federal constitution.

Under its fourth contention the company claims that it has been deprived of the equal protection of the law in violation of the fourteenth amendment because the administrator reduced the company's cash working capital by excluding certain tax accruals from the rate base, notwithstanding that in several prior cases involving other utilities he did not make any deduction of such accruals. There was in evidence considerable testimony by the expert witnesses and certain exhibits illustrative of such testimony concerning the proper allowance of cash working capital in the rate base and the deductions that should be made therefrom by reason of the lag in payment of the federal income tax and the Rhode Island gross earnings tax.

On the basis of certain studies and by averaging, two of the experts testified that 57 per cent of the accruals of such taxes was available to the company for working capital in its business and was in fact so used. The administrator found from such evidence that because of this lag in payment of taxes the stockholders were relieved from furnishing that much working capital. He therefore accepted the testimony of the expert witness George F. Hess and made

due allowance for such tax accruals by reducing the company's item of cash working capital of $2,562,000 in the rate base to $839,000. Regardless of what the administrator may have done in other cases contrary to his procedure here and concerning which there was no issue raised in this court, we are of the opinion that his finding in the case at bar was based on substantial evidence and should not be disturbed. And we are also of the opinion that his finding does not in any true sense deprive the company of the equal protection of the law guaranteed to it under the fourteenth amendment.

However, the company argues that the administrator nevertheless erred in accepting this method of averaging tax accruals for the test year and deducting the amount from necessary cash working capital. In support of its contention it cites *Trunkline Gas Co.* v. *Federal Power Comm'n*, 247 F.2d 159. From our examination of that case it does not appear to lend the company much if any support. In that case the utility presented evidence tending to show that the accruals did not exceed 33.34 per cent but the commission held that 65.55 per cent was available. While the court did not approve that deduction it did recognize the propriety of a credit for tax accruals and of the method of averaging to fix the amount, saying at page 165: "Each is legally permissible because in genuine substance the use of the particular average reasonably assures that the indicated percentage of the total accruals is reasonably available for the utility's current use." Unlike the utility in that case the company here presented no evidence of what would be a fair average. On the contrary it contented itself with outright opposition to the deduction of tax accruals from working capital under any conditions. In such circumstances the action of the administrator was lawful and based on substantial evidence; hence we cannot disturb it.

The company's fifth contention is that the administrator erred in excluding from the rate base certain unfinished

construction at the end of the test year. This item amounted to $2,113,000. A portion of such construction was in service on December 31, 1956. This amounted to $453,000 and there was evidence from the expert witnesses Hess and Melwood W. Van Scoyoc that only such amount should be included in the rate base. The administrator found that the unfinished construction not in service and upon which the company had been capitalizing interest was not properly included in the rate base. He accepted the amount of $453,000 because it closely approximated the beginning and the end of the year average of such construction in service during the test year.

In our opinion he did not err in so doing. The law is well settled that property not actually used and useful does not properly belong in the rate base. This is unquestionably the law in this jurisdiction and this court has so held in *Public Utilities Comm'n* v. *East Providence Water Co.*, 48 R. I. 376, 380. Only the reasonable value of property which is actually being used should be included in the rate base in determining a fair rate of return. *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19. Since the administrator also excluded from earnings used to measure the adequacy of the rates the interest which the company had capitalized, his exclusion of the unfinished construction amount in excess of $453,000 did not deprive the company of anything to which it was lawfully entitled.

In reducing the original book cost by deducting therefrom accrued depreciation the administrator used an estimated depreciation reserve requirement as testified to by certain of the expert witnesses rather than the depreciation account on the company's books. This book depreciation on its electric plant was $20,327,000. The estimated depreciation reserve requirement adopted by the administrator amounted to $25,216,000. The company claims under its sixth contention that the basic premises on which the administrator relied for his conclusion are "utterly erroneous," that his

treatment of its book reserve is contrary to the better authority, and that it has resulted in confiscation of its property in violation of the due process clause of the fourteenth amendment.

In *United Rys. & Elec. Co.* v. *West,* 280 U. S. 234, 253, it was held that annual depreciation should be based upon present value. The state commission had held it should be based upon cost. On appeal the court held such a view was erroneous, but there was a strong dissent by Mr. Justice Brandeis on this point in which Justices Holmes and Stone joined. However, such holding was expressly disapproved and the dissent in effect was approved later in *Federal Power Comm'n* v. *Hope Natural Gas Co.,* 320 U. S. 591. After stating therein that in *Lindheimer* v. *Illinois Bell Tel. Co.,* 292 U. S. 151, they had previously recognized the propriety of basing annual depreciation on cost the court at page 606 said: "By such a procedure the utility is made whole and the integrity of its investment maintained. No more is required." In the *Lindheimer* case it was recognized that accrued depreciation and annual depreciation should be consistently determined.

The precise method of determining past depreciation has not yet been judicially settled. Various methods have been accepted by different regulatory bodies. One view is that such depreciation "is a fact to be determined at the time of the rate case inquiry. It is computed by a qualified expert, estimating the loss experienced up to that time in a given asset or property, due to all of the factors causing the ultimate retirement of that asset or property. This view does not admit any necessary relationship between the annual accrual made for depreciation, by the accountants, as a charge against operations for a given year, and the annual depreciation which, in fact, took place in the property of that year." Welch, Preparing for the Utility Rate Case, page 184.

The administrator found that "the actual accrued depre-

ciation, which measures the loss in service value of the Company's property, should be deducted from the original cost of the Company's plant." It appeared from the evidence that two of the company's experts testified to a certain actual loss in service value of its property and the public utility division's expert witness Martin T. Bennett, basing his testimony on the conclusions of those witnesses, testified that there has been a greater loss in service value of the company's property than it had entered in its books. He estimated such deficiency at $6,023,000. The company did not present any testimony specifically to the contrary but contented itself with relying on the fact that its retirement reserve had not been imprudent but had been kept in accordance with accounting practices approved by the division of public utilities. It further argues that the administrator could have questioned such reserve if at any time he was of the opinion that it was inadequate and that since he had not done so he should now be deemed to have sanctioned it.

From an accounting viewpoint the company should not be penalized for failing to follow a method of depreciation that would have accounted more accurately for an actual loss in service value of its property. But the question before the administrator was not one of determining whether the company's accounting practices conformed to accounting regulations of the division but whether or not the method which it had used correctly reflected on its books the actual loss in service value of its property so that it could be accepted as a deduction in determining its rate base. It must not be lost sight of that what the administrator was here concerned with was not annual depreciation but accrued depreciation, a capital deduction which recognizes the depreciation of plant and property that has *already taken place.*

We are of the opinion that on the evidence before him the administrator did not err in deducting an estimated

accrued depreciation reserve based on the straight-line method and that he was not precluded from doing so merely because the company's book reserve was in conformity with an accounting method previously approved by the public utility division. *Public Service Coordinated Transport, Etc.* v. *State,* 5 N. J. 196, 218. We do not think that the company has thereby suffered any real deprivation of its property.

In any event the administrator to some extent has compensated the company for the resultant hardship, if any, by accepting its annual depreciation expense of $3,219.000. Thus he stated in his order: "By allowing the book annual depreciation which, in effect is remainder life annual depreciation, the Company will be able to eliminate gradually the deficiency in its present book reserve." While the company does not reject such concession in its favor it does point out that it represents a treatment of annual depreciation that is inconsistent with the administrator's treatment of accrued depreciation. Be that as it may, since the company is the only appellant here and has not made such treatment of annual depreciation a reason of appeal we need not be concerned with the matter further. However, it is of some interest in this connection to note that substantially the same kind of an adjustment was expressly approved in *Harrisburg Steel Corp.* v. *Pennsylvania Public Utility Comm'n,* 176 Pa. Super. 550, and *Duquesne Light Co.* v. *Pennsylvania Public Utility Comm'n,* 176 Pa. Super. 568.

On our view of the evidence we cannot say that the administrator's treatment of the accrued depreciation reserve was either unsound or unreasonable. And on our view of the law we do not find that his action in the premises was unlawful. Such authorities to the contrary that the company cites are not in our opinion of such compelling weight that they should be followed. Finally, it is almost needless to say that the company has not, in the true legal sense of

that term, suffered confiscation of its property in violation of the due process clause of the fourteenth amendment.

Under its seventh contention the company claims that the administrator erred in the method he used in separating its interstate business from its intrastate business, first because that method violated the commerce clause, article I, sec. 8, of the federal constitution, and secondly, because it violated the due process clause of the fourteenth amendment thereto. The company also makes a number of subsidiary arguments principally to the effect that the expert witness Hess upon whom the administrator relied was not competent to testify as an expert on the proper method to separate and allocate interstate and intrastate revenues.

There is no merit in this last contention. The competency of a witness to testify as an expert is to be decided by the administrator in the exercise of his sound discretion and his decision will not be disturbed by this court unless it is clear that he abused his discretion. We have considered the nature of the qualifications of the witness Hess and have noted the critical comments made adversely thereto by the company. On our view such comments on the whole go to the weight to be given to the witness' testimony rather than to his competency. Therefore we cannot say that the administrator has clearly abused his discretion in allowing him to testify as an expert.

Insofar as the content of his testimony on the issue of separation, particularly with reference to calculating and allocating the company's generating reserve capacity is concerned, the administrator was confronted substantially with the choice of either relying thereon or on the testimony of the witness Paul B. Metcalf, the company's engineer. He had extensive engineering experience in the problems of generating and transmitting electric energy but apparently no previous experience testifying as an expert on the issue of separation in a rate case. On the other hand witness Hess appears to have had a substantial prior experience

along that line and is also a professional engineer. Unlike Metcalf he has previously testified in such proceedings both federal and state. In this matter the credibility of the witnesses and the weight of their testimony were clearly for the administrator. Nothing in the record to which our attention has been called would, in our opinion, warrant us in holding that he erred in preferring to accept and rely on Hess rather than on Metcalf.

In accepting the method used by Hess we do not think the administrator invaded the field of interstate commerce or that his decision casts any burden thereon. It is recognized that this matter of making appropriate separations of properties, revenues and expenses is extremely difficult and can never be resolved with precision. Much must be left to the considered judgment of the administrator after hearing pertinent evidence on the subject. From our examination of the transcript we are of the opinion there is substantial evidence here to support his finding and that he was not clearly wrong in accepting the allocations testified to by Hess based upon his study of the problem. There is no merit in the company's contentions that his decision is an indirect attempt to regulate interstate commerce and that it violates the due process clause of the fourteenth amendment. It is not in any sense, as we see it, the same problem that confronted the court in *Attleboro Steam & Elec. Co.* v. *Public Utilities Comm'n*, 46 R. I. 496, aff'd 273 U. S. 83.

In that case the commission sought to fix the rate on sales of electricity in interstate commerce under the guise of protecting local interests served by the intrastate vendor. Here no rate fixing on such sales is designed either directly or indirectly. As the administrator quite properly states in his order, it was his duty to make a reasonable finding of the cost associated with the company's rendering of intrastate service and that the company itself assumed that this was his duty in these rate proceedings by presenting for

his consideration a separation study of their own. In making that finding, if he was to perform such duty he could not avoid the necessity of allocating a portion of the total costs of the company to the interstate service rendered under its contracts. Table III set out in his order illustrates his finding better than any statement which we could make and we therefore quote it here.

"Table III

Summary Rate Base and Net Income Separated
Between Interstate and Intrastate Operations

|  | I Total Company | II Interstate | III Intrastate |
|---|---|---|---|
| Rate Base |  |  |  |
| Electric Plant in Service | $134,034,000 | $18,669,000 | $115,365,000 |
| Less Depreciation | 25,216,000 | 2,977,000 | 22,239,000 |
| Net Plant in Service | $108,818,000 | $15,692,000 | $ 98,126,000 |
| Unfinished Construction | 453,000 | 27,000 | 426,000 |
| Plant Held for Future Use | 404,000 | 100,000 | 304,000 |
| Materials and Supplies | 4,345,000 | 898,000 | 3,947,000 |
| Cash Working Capital | 839,000 | 545,000 | 294,000 |
| Contribution in Aid of Construction | (79,000) | — | (79,000) |
| Total Rate Base | $115,280,000 | $ 17,262,000 | $ 98,018,000 |
| Operating Income |  |  |  |
| Operating Income per Exhibit D-2 | $ 5,830,000 | $ (77,000) | $ 5,907,000 |
| Adjustment to Reflect book annual depreciation expense | (221,000) | (41,000) | (180,000) |
| Adjusted Operating Income | $ 5,609,000 | $ (118,000) | $ 5,727,000 |
| Rate of Return Earned | 4.87% | — | 5.84%" |

Under its eighth contention the company claims that the administrator erred in determining what was a fair rate of return on its rate base. He fixed as a just and reasonable rate 5.84 per cent, which is the rate the company is earning on its existing tariffs. He arrived at this rate by first de-

termining on the evidence before him what was the company's cost of capital and then adjusting such cost by allowing the company to make its next financing in common and preferred stocks rather than by a combination of stocks and bonds which the public's expert witness, Dr. Eli W. Clemens, testified would be at a cost of 5.39 per cent.

Ordinarily the cost of servicing borrowed capital can be readily determined but the same is not true of equity capital. Only a general norm or standard which should govern the administrator in determining what is a just and reasonable rate of return may be safely laid down. In *Federal Power Comm'n* v. *Hope Natural Gas Co.*, 320 U. S. 591, at page 603, this was stated as follows: "From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. * * * By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital."

However, in an earlier case the United States Supreme Court stressed the public character and privileged nature of a public utility and expressly stated that it could not claim the benefit of rules applied to businesses that were entitled to speculative profits. *United Fuel Gas Co.* v. *Railroad Comm'n*, 278 U. S. 300. In *Bluefield Water Works & Improvement Co.* v. *Public Service Comm'n*, 262 U. S. 679, the court stated at page 692: "A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended

by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures." In other words a public utility is not entitled to an increase in rates in order to be able to earn profits comparable to those that are possible for unregulated private industry to earn. On the other hand it is entitled to an increase whenever existing rates are found to be confiscatory. Conversely a nonconfiscatory rate of return is a just and reasonable rate.

In the case at bar there was substantial evidence which the administrator could reasonably credit to the effect that the company's cost of capital was 5.39 per cent. He did not confine his judgment of what the company needed to such cost but fixed a rate of 5.84 per cent which is considerably in excess thereof. Apparently in weighing all the evidence before him he was of the opinion that something more than current interest on invested capital was required in the company's present circumstances to render efficient public service.

On our view of the evidence we cannot say that such a rate is not just and reasonable. What is reasonable is a relative term dependent upon varying circumstances and is therefore to be determined by the facts of each case. *Public Utilities Comm'n* v. *East Providence Water Co.*, 48 R. I. 376; *Lindheimer* v. *Illinois Bell Tel. Co.*, 292 U. S. 151; *Los Angeles Gas & Elec. Corp.* v. *Railroad Comm'n*, 289 U. S. 287; *Bluefield Water Works & Improvement Co.* v. *Public Service Comm'n, supra.* The rate fixed by the administrator is presumed to be reasonable until evidence is presented to the contrary, and the burden is on the party asserting it is unjust and unreasonable to prove such assertion by clear and convincing evidence. *Town of Middletown* v. *Newport Water Corp.*, 53 R. I. 435. Only where the evidence demonstrates that the rates so fixed are clearly, palpably and grossly unreasonable will the court interfere.

12 McQuillin, Municipal Corporations (3d ed.), §34.160, p. 493. See also *City of Knoxville* v. *Knoxville Water Co.,* 212 U. S. 1; *Darnell* v. *Edwards,* 244 U. S. 564, 569. The company's evidence does not convince us that the rate of 5.84 per cent is confiscatory; hence it has not, in our opinion, been denied due process under the fourteenth amendment.

The company's ninth contention that the administrator erred in denying and dismissing its plan for rate simplification is without merit. In our opinion this is a matter which is peculiarly within the province of the administrator and subject to his sound discretion. Unless it clearly appears that he has abused his discretion we will not review his finding. From our view of the evidence it does not appear that he committed such abuse.

Under its tenth contention the company claims that the administrator committed prejudicial error in his conclusions and orders with reference to a fuel adjustment clause in its electric rates. We do not think there is any merit in such contention. This too appears to us to be a matter peculiarly of an administrative nature where there is broad room for the exercise of a sound discretion by the administrator as the agent of the legislature. Only if in the exercise of such discretion he has arbitrarily denied the company some constitutional right should this court disturb his finding. In the present instance we are aware of no reason of that nature as a ground of judicial interference with this particular order.

The company contends that the administrator erred in failing to approve or disapprove the gas price adjustment clause in its proposed gas rate schedules. This is its eleventh contention and is based on *United Electric Rys.* v. *Kennelly,* 80 R. I. 64, where we held the administrator committed error in not performing his full statutory duty in the circumstances. While there are some differences in that case and the one at bar, we nevertheless are of the

opinion that there is a sufficient similarity in the fundamental point at issue under the company's contention to justify its claim that the administrator erred. Under the statute it was his duty to decide the issues properly before him and not defer his decision to an indefinite time in the future when he may be called upon to decide such issue in a similar case or cases. We think that the case should be remanded to the administrator with direction to decide this issue. We express no opinion as to how it should be decided regardless of the state of the evidence with reference to the reasonableness of such price adjustment clause. This is a matter for decision in the first instance by the administrator and not by this court.

Under its twelfth contention the company argues that the administrator committed prejudicial error in rejecting bimonthly billing proposed in its electric and gas rate schedules. It contends that there is no evidence in the record upon which such rejection could be reasonably based, whereas there is substantial evidence that such billing is used in other parts of the country, that it would save the company about $150,000 a year, and that billing by water utilities in this state for a longer period than one month is common.

We think there is merit in the company's contention. This is an incident of management that as far as appears from the evidence would not have an adverse effect on any rights of ratepayers to be charged no more than just and reasonable rates. In our opinion, therefore, the administrator should not interfere in this function of management unless there was substantial evidence tending to prove that bimonthly billing would be an unjust and unreasonable burden on the ratepayers. No such evidence has been called to our attention. Ordinarily the mere fact of invasion of management by the administrator is not a good ground of error since the whole regulatory process of rate making is itself a species of such invasion. However, to be valid in

any of its phases and stand up under judicial review the exercise of the process must rest on just and reasonable grounds. The vice of the administrator's order in the present instance is that it lacks such grounds. We are, therefore, of the opinion that the company should be allowed to bill its ratepayers bimonthly as proposed in its electric and gas schedules.

Under its thirteenth contention the company refers to several rulings of the administrator on the admission and exclusion of certain evidence and contends that they constitute prejudicial error. We have examined such rulings and we are of the opinion that in view of the wide latitude allowed the administrator in the conduct of hearings they were not erroneous. It is generally recognized that customary practices and rules of court procedure are not a necessary incident to hearings before public utility commissions. 73 C.J.S. Public Utilities §49, p. 1115. But rules conducive to a fair and impartial hearing may not be dispensed with although the regulatory body is endowed with a wide discretion on the admissibility of evidence generally. 73 id. §53, p. 1119. We do not find that any of the alleged errors reasonably tended to deprive the company of such a hearing. On the contrary our examination leads us to the conclusion that the company was afforded ample scope to develop in every reasonable way the highly technical evidence upon which it based its claim to increased revenues. There is therefore no merit in this contention.

The company's appeal is sustained in part, and the cause is remanded to the administrator with direction to approve or disapprove the gas price adjustment clause in the company's proposed gas rate schedule and to amend his order with reference to bimonthly billing in accordance with this opinion. As to all other reasons of appeal, the appeal is denied and dismissed, and the orders of the administrator are affirmed.

*T. Dexter Clarke, Edwards & Angell, Gerald W. Harrington, Ronald R. Lagueux,* for petitioner.

*J. Joseph Nugent,* Attorney General, *Archie Smith,* Assistant Attorney General, *Julius C. Michaelson,* Special Counsel, *Anthony A. Giannini,* for respondent.

*Joseph Mainelli,* for United States.

Amici Curiae:

*William E. McCabe,* City Solicitor, for City of Providence.

*Ralph T. Lewis,* City Solicitor, for City of Warwick.

*Michael DeCiantis,* Town Solicitor, for Town of West Warwick.

*James O. Watts,* Town Solicitor, for Town of Narragansett.

*James H. Donnelly,* Town Solicitor, for Town of North Kingstown.

*William H. Leslie, Jr.,* Town Solicitor, for Town of South Kingstown.

*Abraham Belilove,* for James Hanley Company.

*John Quattrocchi, Jr.,* for 35 Qualified Electors.

*Aram K. Berberian,* for United Commercial Travelers and Pro Se Ipso.