**PROVIDENCE GAS COMPANY**

v.

**Edward F. BURKE, in his capacity as Administrator, Division of Public Utilities and Carriers.**

**Dennis J. ROBERTS II, in his capacity as Attorney General of the State of Rhode Island et al.**

v.

**PROVIDENCE GAS COMPANY.**

Nos. 79-366-M.P., 79-367-M.P.

Supreme Court of Rhode Island.

Aug. 22, 1980.

## OPINION

WEISBERGER, Justice.

These are statutory petitions for certiorari wherein Providence Gas Company (the company), Edward F. Burke, in his capacity as administrator of the Division of Public Utilities and Carriers (the division), and the Attorney General all seek review of an order rendered by the Public Utilities Commission (the commission) in response to the filing by the company of proposed tariffs which would have produced additional estimated annual revenues of $7,556,141. Ultimately, on September 27, 1979, the commission granted the company a revenue increase of $4,436,000. The company seeks review of the portion of the commission's order which reduced the company's rate base by $4,305,940, an amount found by the commission to constitute a "deficiency" in the company's reserve book account for depreciation. The division seeks review of that part of the order of the commission which allowed the company to charge additional amounts for depreciation so as to recover over the remaining useful life of its assets the depreciation "deficiency." The division also seeks review both of the commission's refusal to make a revenue adjustment for alleged changes in revenue to be anticipated from additional sales and of the commission's refusal to reduce the company's working-capital requirement to reflect the availability for investment of funds accumulated for the payment of periodic accrued interest on long–term debt. Additionally, both parties were requested by the court to brief and argue the following question:

"In instances where the Attorney General is challenging an order of the Public Utilities Commission, should not the Division of Public Utilities and Carriers, whose director also acts as chairman of the Commission, assume the defense of the Commission's order by invoking the provisions of G.L. 1956 (1977 Reenactment) § 39–1–20 and employ its own legal counsel as it defends the order?"

As we deal with each of the matters presented for review by these petitions, we

Hinckley, Allen, Salisbury & Parsons, Michael P. DeFanti, Robert J. Ferranty, Providence, for Providence Gas Co.

Dennis J. Roberts, II, Atty. Gen., John R. McDermott, Sp. Asst. Atty. Gen., for Dennis J. Roberts, II, and Edward F. Burke.

shall set out the facts that are pertinent to the resolution of the contentions of the parties.

## DEPRECIATION DEFICIENCY AND REDUCTION OF RATE BASE

In 1976 the company engaged Reginald R. Bird, a vice president of Stone & Webster Management Consultants, Inc., to perform a depreciation study of the company's plant in service as of December 31, 1976. Upon completing this study in 1977, Mr. Bird recommended that the annual composite depreciation rate be increased from 2.44 percent to 2.68 percent of the company's total depreciable plant. In an ensuing rate case (P.U.C. Docket No. 1258), based upon tariffs filed by the company on December 13, 1976, the commission, in an October 14, 1977 report and order, allowed tariffs which included the increased depreciation rate. This order was not appealed.

On December 27, 1978, the company filed for new rate increases but did not request any change in the depreciation rate that had been approved in 1977 (P.U.C. Docket No. 1258) since no further depreciation study had been performed since 1976.

The division analyzed the 1977 Bird study and contended that the changed rate of depreciation, had it been applied in prior periods, would have resulted in a total theoretical accrued depreciation reserve that would have been greater by $4,305,940 than what was actually accrued on the company's books as of September 30, 1978 (the end of the test year on which the new tariff filing was based). The division and the commission labeled this sum as a "deficiency." The division contended that the rate base should be decreased by the amount of this "deficiency" and that the company be denied permission to recover the "deficiency" over the remaining useful life of the assets. The commission reduced the rate base by $4,305,940 but allowed the company to continue to deduct the same percentage for depreciation that had been previously approved, since "th[e] evidence does not suggest that the deficiency is long standing or that the Company has profited from it." The commission went on to state:

"In this case the Commission is also mindful of the fact that while the subject of valuation (rate base) was not addressed in the last case, the Division did accept the prospective application of the depreciation rate proposed by the Company. In light of The Division's position in the prior case and the evidence referred to above, the Commission is not inclined to upset the depreciation rate which was established in the prior case on the basis of this record."

Both parties seek review of this order.

Essentially both parties agree that depreciation constitutes a means of amortizing the cost of assets over the probable useful life of such assets. As pointed out by James C. Bonbright in Bonbright, *Principles of Public Utility Rates* 213 (1961):

"In modern regulation, the allowances for 'depreciation' both as operating expenses and as deductible reserves are designed to cover so–called functional depreciation including obsolescence and not merely physical deterioration or wear and tear. Hence the allowances must be based on estimates or plausible assumptions as to the effect of obsolescence on useful–life expectancies. But neither a corporate management nor a commission can hope accurately to predict, years in advance of the event, the dates as of which old properties may need to be retired for reasons of 'extraordinary obsolescence.'

"To a material extent, the harm arising from this lack of prophetic vision can be minimized by midstream re–estimates of remaining–life expectancies and hence by reasonable step–ups or step–downs in annual depreciation charges, so that the dates of complete amortization can be made to correspond fairly well to the dates of the actual retirement. This procedure is much more readily employed under 'group methods' of depreciation accounting, whereby the premature retirements of some assets are offset by the longevity of other assets in the same group."

There is no question that the company in this instance has within its rate base a highly complex multiplicity of assets, plant, and equipment, with varying periods of anticipated life. Normally the cost of an asset would be amortized over its probable useful life minus a net salvage value. Obviously, this probable useful life is only an approximation which may be modified by unanticipated obsolescence due to technological changes, changes in federal statutes and regulations, and changes in sources and types of energy supplies. Additionally, the severe impact of inflation has introduced a concept of "negative salvage value" whereunder significant additional costs would be incurred upon the retirement of a given asset.

There is no evidence in the record to indicate in any way that the company was imprudent or negligent in failing to revise its depreciation figures prior to 1976 to reflect these changes. No challenge was raised to the modified depreciation percentages in the previous rate hearing (P.U.C. Docket No. 1258). There is no evidence in the record to indicate that the company has recovered the deficiency in any other way than by allocation to annual depreciation expense. The commission's specific finding that the company has not "profited" from the deficiency strongly indicates that there has been no recovery of the sums represented by this deficiency through rate of return or otherwise. It also seems obvious that an element of this "deficiency" is the negative salvage value to be incurred upon the retirement of the asset. This negative salvage value, although a part of the "deficiency," has never been a part of the rate base.

In the regulation of public utilities, a stable and, insofar as practicable, a simple method of allocating cost is to be desired. No system of depreciation, straight–line or otherwise, can result in a perfect allocation of cost with uniform temporal apportionment. Bonbright, *supra* at 208, addresses this problem as follows:

> "Aware of the vague and unsatisfying nature of any attempt to rationalize the choice of a method of depreciation accounting by reference to some basic 'theory' of temporal cost apportionment, such as a relative–benefit theory, one may be tempted to conclude that, within wide limits, any method of amortization is as good as any other. This conclusion, however, does not follow. For the relative merits of alternative methods are subject to appraisal in the light of criteria of usefulness *other than those suggested by any assumed ideal standard of fairness among the consumers of different periods.* The importance properly attached to other criteria is all the greater in view of the fact that most public utility consumers are fairly steady customers and hence that *any* chosen method of cost amortization, consistently followed, will to a material degree offset in a later period of time deficiencies or excesses of an earlier period." (First emphasis added; second in the original).

In response to a similar problem, the New York Public Service Commission in *Iroquois Gas Corp.*, 85 P.U.R.3d 356 (N.Y. Pub. Serv. Comm'n 1970), declined to penalize a company whose book account for depreciation had developed a $3,962,340 deficiency resulting from changes in negative salvage and average service life. Having been persuaded that the revisions in depreciation that had been made reflected prudent practices, the New York commission held that exclusion of the deficiency from the rate base "would deny Iroquois a full and proper return on its investment." The New York commission posed the question as "not whether the consumer is being required to pay for the company's mismanagement but, rather, whether a company should be required to operate unconditionally at its peril with respect to the uncertainties of business." *Id.* at 359–60. The New York commission considered the answer to the latter question to be clearly in the negative, and so do we.

Having previously approved a revised depreciation rate in an order from which no appeal was taken, and having found in essence that the company had not recovered the costs represented by the deficiency in

its book account in any other way, the commission would be acting confiscatorily to remove this so—called deficiency from the rate base, thereby penalizing the company for its lack of precise clairvoyance. The division cites *Narragansett Electric Co. v. Kennelly*, 88 R.I. 56, 76, 143 A.2d 709, 721 (1958), for the proposition that "property not actually used and useful does not properly belong in the rate base." Not a shred of evidence is present in this record to indicate that the discrepancy between book-value depreciation and the hypothetical accrued depreciation that would have resulted from the retroactive application of the revised rates in any way represents property not actually used or useful in the light of the composite depreciation account utilized by the company. Thus, the commission erred as a matter of law in reducing the rate base by the sum of $4,305,940.

▆ The commission was correct in allowing the depreciation rates that it had previously approved in 1977 to continue. The rates the commission had previously set in Docket No. 1258, including the depreciation factor, were presumptively valid. *See Narragansett Electric Co. v. Kennelly*, 88 R.I. at 84, 143 A.2d at 725; *see also Blackstone Valley Chamber of Commerce v. Public Utilities Commission*, R.I., 396 A.2d 102, 104 (1979); *United States v. Public Utilities Commission*, R.I., 393 A.2d 1092, 1095 (1978). The party seeking to change such a previously approved rate has the burden of persuasion on this issue. *United States v. Public Utilities Commission*, 393 A.2d at 1094; *Narragansett Electric Co. v. Kennelly*, 88 R.I. at 84, 143 A.2d at 725. As the commission pointed out in its report and order, "[t]he Division offered no evidence on this issue." Thus, the commission found as a fact that the division had failed to sustain its burden of persuasion in respect to the previously revised rate of depreciation. Generally, a finding of fact by the commission, based upon substantial evidence or a presumptively valid prior determination, is unassailable on review. *See*

*Valley Gas Co. v. Burke*, R.I., 406 A.2d 366, 369 (1979); *Rhode Island Consumers' Council v. Smith*, 111 R.I. 271, 277, 302 A.2d 757, 762 (1973). In the instant case the principles applied by the commission were consistent with those applied in *Valley Gas Co. v. Burke, supra*. In *Valley Gas*, the commission rejected the utility's request to amortize a depreciation "deficiency," on the ground that the utility had failed to sustain its burden of proving that the deficiency had not been otherwise recovered. In this case the company had sustained its burden of persuasion in the prior hearing and the division failed to sustain its burden of showing that the prior determination was improper or unjust. Thus, the commission's finding on this issue is sustained.

## THE CLAIMED ADJUSTMENT FOR ANTICIPATED ADDITIONAL SALES

▆ The next ground of review advanced by the division is based upon a comment by a rebuttal witness presented by the company. Mr. John J. Natalizia, during the course of his testimony, estimated that the company would have about 2,000 additional heating customers when these proposed rates would become effective, as compared with the test year. He also observed that the addition of these customers would make less gas available for interruptible customers.[1] On the basis of this comment, the division sought to have the estimated revenue from these anticipated new customers included in the calculation of the proposed rates under consideration. The commission did not include such revenues in its calculations. These revenue estimates had not been included in the test year and were matched by no corresponding data concerning capital expenditures and variable operating expenses, save a most general statement by Mr. Natalizia that, given such added revenues, an additional $3 million of plant investment would be made along with an additional $500,000 in gross margin. Consideration by the commission of this ele-

---

1. An interruptible customer is generally an industrial user who seeks gas service intermit-
tently depending upon availability of gas and costs of alternative energy supplies.

ment of information not included in the rate–case preparation would have completely set aside the test–year concept. The test–year concept results in bringing before the commission a complete picture of revenues and expenses based upon an historical period for which data pertaining to such revenues and expenses may be accurately obtained and tested in order to project reliable estimates into the future. The Washington Utilities and Transportation Commission presents a persuasive analysis of this concept in *Pacific Power & Light Co.*, 7 P.U.R.4th 470, 476–77 (Wash. Util. & Transp. Comm'n 1974), in the following terms:

"A most fundamental concept is that revenues, expenses, net operating income, and investment have an interrelationship and that this interrelationship is depicted by the actual year selected for test–year purposes. Therefore one–sided restatements and adjustments, such as to expenses without all other necessary revenue or investment restatements, would distort results and these actual relationships. Conversely, revenue adjustments without all necessary expense or investment restatements would be equally distorting; so would making investment restatements without all related revenue and expense adjustments."

Had the commission considered this asymmetrical element and thrust aside the test–year concept, it would have moved into an area of speculation upon which a factual conclusion cannot properly rest. *See United States v. Public Utilities Commission*, 393 A.2d at 1095. Thus, the conclusion of the commission in this instance not to consider the element of information under discussion was clearly correct.

### THE DIVISION'S CLAIM IN RESPECT TO REDUCTION OF WORKING CAPITAL TO REFLECT THE AVAILABILITY OF ACCRUED INTEREST ON LONG–TERM DEBT

The division seeks review of the commission's determination not to reduce the allowance for working capital accorded the company by reason of cash–flow advantages allegedly conferred upon the company on account of its ability to invest funds collected from rate payers prior to the dates of periodic payment of interest on long–term debt. The commission rejected this contention based upon our holding in *Michaelson v. New England Telephone & Telegraph Co.*, R.I., 404 A.2d 799, 805 (1979), wherein we, in reliance on *Rhode Island Consumers' Council v. Smith*, 113 R.I. 384, 394, 322 A.2d 17, 23 (1974), held as a matter of law that accrued interest expense could not be considered in reduction of working capital. The arguments advanced by the division do not persuade us to reject the concepts upon which our determination in *Michaelson* was based.

### THE ROLE OF THE DIVISION WHEN THE ATTORNEY GENERAL CHALLENGES AN ORDER OF THE PUBLIC UTILITIES COMMISSION

At the request of the court the parties to this case have briefed and argued the issue of the role of the division in instances in which the Attorney General has challenged an order of the commission.

In this state the Legislature has created a Division of Public Utilities and Carriers in order to implement the policies of the state in regulating public utilities and carriers so as to achieve ultimate policy goals of providing for adequate, efficient, and economical energy, communication, and transportation services and water supplies at just and reasonable rates. The chief officer of the division is the administrator. General Laws 1956 (1977 Reenactment) § 39–1–2. The Legislature has also created a Public Utilities Commission consisting of three persons who serve as a quasi–judicial tribunal with jurisdiction to hold investigations and hearings involving rates, tariffs, and charges made by public utilities. Sections 39–1–3 and 39–1–4. The chairman of this commission by virtue of his office also serves as the administrator and chief executive officer of the division. Section 39–1–3. *See Narragansett Electric Co. v. Harsch*, 117 R.I. 395, 402–06, 368 A.2d 1194, 1199–1202 (1977).

Upon request by the administrator, the Attorney General will represent the division in a public–utility proceeding. Section 39–1–19. The Attorney General may also intervene in such a proceeding on behalf of the State of Rhode Island or its citizens, and the division may employ independent legal counsel to represent it in such circumstances. *Id.*; § 39–1–20.

Thus, the somewhat incongruous situation may arise wherein the administrator despite his capacity as chairman of the commission may, pursuant to § 39–5–1, seek review of a unanimous decision of the commission in his capacity as administrator of the division. In their brief the division and the Attorney General argue that the incongruity is more apparent than real. They point out that the responsibility for the division's positions in a rate case is delegated to division personnel other than the administrator so as to avoid any conflict–of–interest problems. They also point out that in some instances the chairman (the administrator) may dissent from the decision of his fellow commissioners or may not participate in the decision, or the commission may be required to act in compliance with judicial decisions with which the commission disagrees; in these situations the chairman may not wish to assume the defense of the commission's order. The company argues that the division ought not to seek review of its administrator's own decision rendered by him as chairman of the commission but asserts that it is the obligation of the division to defend a decision made by the commission. It further argues that if the Attorney General wishes to challenge a commission decision, he should not represent the division at commission proceedings, and that in such circumstances the division should retain separate counsel. The company concedes the right of the Attorney General to intervene in commission proceedings and seek review of commission decisions, as long as he has not represented the division in those proceedings.

We believe that a symmetrical interpretation of the legislative plan would best be served by the following allocation of functions among the division, the commission, and the Attorney General.[2]

■ In any case in the discretion of the administrator, the Attorney General may be retained in order to represent the division in proceedings before the Public Utilities Commission. In the event that the administrator foresees that there will be a conflict between the division and the Attorney General, he may, of course, retain independent counsel to represent the division.

In the event that following a commission decision the Attorney General, having previously represented the division, desires to seek review, he should do so in his own name rather than on behalf of the division. In our opinion it is the function of the division to serve the commission in bringing to it all relevant evidence, facts, and arguments that will lead the commission in its quasi–judicial capacity to reach a just result. Once the commission has made its decision, it is inappropriate for the division and its administrator to challenge that decision, even when the administrator (chairman) has dissented. In such a situation, the people and rate payers of the State of Rhode Island may most properly be represented by the Attorney General in seeking review of the commission's decision. The Attorney General need not be precluded from seeking such review merely because he has previously represented the division as counsel.

■ In the event of a challenge by statutory petition for certiorari of a commission decision, brought by the Attorney General as representative of the state or the citizens of the state, the division may retain its own counsel in order to defend the commission's decision or it may rely upon the adversary party to the proceedings to defend the decision.

**2.** We have already held in *Narragansett Electric Co. v. Harsch*, 117 R.I. 395, 406, 368 A.2d 1194, 1201 (1977), that the commission is not a proper party in statutory petitions for certiorari and that the division should be a party in an appellate proceeding wherein its function was defense of a commission order. We have not heretofore addressed the role of the division when a commission order is challenged by the Attorney General.

In the event of a petition for review of a commission decision, brought by a utility that is aggrieved by such decision, the division may in the discretion of its administrator continue to seek the services of the Attorney General or may engage independent counsel in the event of a conflict of positions between the division and the Attorney General.[3]

The statement of principles in respect to standing and representation set forth above shall apply to future proceedings before the commission and on certiorari before this court. These principles have not been applied to alter the standing of any party to the present controversy.

For the reasons heretofore stated, the petition for certiorari filed by the company is granted insofar as the commission has purported to reduce the company's rate base by the sum of $4,305,940, and that portion of the commission's decision is quashed. The records certified to the court are ordered returned to the commission with the direction that it adjust the tariff rates sought by the company to reflect the inclusion of this sum in the rate base.

The petition for certiorari filed by the division and the Attorney General is hereby denied, the writ heretofore issued is quashed, and the records certified to this court are ordered returned to the commission with our decision endorsed thereon.

---

**3.** It should be noted, as was pointed out in *Harsch*, 117 R.I. at 404 n.5, 368 A.2d at 1200 n.5, that the Rhode Island Consumers' Council pursuant to G.L.1956 (1977 Reenactment) § 39–1–17 may also participate in proceedings before the commission and on certiorari before this court.