DECISION
This case is before the Court on appeal from a decision of the Division of Public Utilities and Carriers of the State of Rhode Island (Division). The appellants, Interstate Navigation Company (Interstate) and the Town of New Shoreham (New Shoreham), are seeking reversal of a Report and Order of the Division which granted a water carrier certificate (Certificate) to Island Hi-Speed Ferry, LLC (Hi-Speed Ferry) to operate a high-speed ferry service between Galilee and Block Island, Rhode Island.[1]
Jurisdiction is pursuant to G.L. 1956 § 42-35-15.
 Facts and Travel
On February 20, 1998, Hi-Speed Ferry filed an application with the Division for a Certificate of Public Convenience and Necessity to operate a ferry service from Galilee, Rhode Island to Block Island, Rhode Island. On February 23, 1998, in anticipation that it might begin offering service to the public as early as the summer of 1998, Hi-Speed Ferry submitted a request for an expedited hearing to occur not later than the end of March 1998.
Specifically, Hi-Speed Ferry's application sought the authority to operate a 149 passenger high speed catamaran from the Port of Galilee in the Town of Narragansett, Rhode Island to Payne's Dock in New Harbor, in the Town of New Shoreham (Block Island), Rhode Island. The application detailed a proposed service schedule, which includes full service during the peak summer hours and a reduced offering during the month preceding and the month following the peak season. The proposed service excluded ferry service for freight, automobiles and bicycles. According to the application, Hi-Speed Ferry would charge $26.00 for an open-ended round-trip ticket.
On February 26, 1998, Interstate filed a Motion to Intervene as a full party/protestant in the licensing proceeding. At the time and presently, Interstate is the sole provider of public ferry service between the port of Galilee and Block Island. On March 2, 1998, New Shoreham filed a separate Motion to Intervene. On March 5, 1998, the Division held a prehearing conference to address both Motions to Intervene. Bruce A. Stevenson (Stevenson), Hearing Officer of the Division, allowed the interventions of Interstate and New Shoreham and approved a procedural schedule which set deadlines for prefiled direct testimony, guidelines for discovery, and set six dates for hearings in Providence, Narragansett, and New Shoreham.
After extensive hearings, the record closed on June 26, 1998. On August 25, 1998, Thomas Ahern (Ahern), Administrator of the Division, issued a Report and Order, affirming Stevenson's recommendation, that Hi-Speed Ferry was "fit, willing and able" to provide the proposed service and that Hi-Speed Ferry had met its burden of proof in showing that the public convenience and necessity would be served by its offering the proposed service. Thus, the Division approved Hi-Speed Ferry's application for a water carrier certificate and issued the approval subject to the following conditions:
 1. That, prior to offering service to the public, the Applicant must provide the Division with sufficient documentation proving that [it] has complied with all necessary government regulations (i.e. U.S. Coast Guard, state and local permits) to fulfill the requirements reflected in the record;
 2. That the vessel utilized by the Applicant to provide the service contain all the amenities stated in the Applicant's testimony and business plan, and that the services provided conform with the evidence in the record;
 3. That the Applicant file with the Public Utilities Commission and have approved, tariffs reflecting the rates and charges outlined in the business plan;
 4. That the Applicant submit proof of insurance and also hand-deliver to this office a copy of approved tariffs reflecting the rates, charges and schedule of runs; and
 5. That prior to offering service to the public, the Applicant notify the Division and allow it to inspect the vessel to ensure compliance with this Order.
Interstate and New Shoreham thereafter filed separate appeals with the Court pursuant to the State's Administrative Procedures Act.
 Standard of Review
This Court will review the decision of the Division pursuant to G.L. 1956 § 42-35-15 (g), which provides that when reviewing a contested agency decision:
 (g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
This section precludes a reviewing court from substituting its judgment for that of the agency with regard to the credibility of witnesses or the weight of evidence concerning questions of fact. Costa v. Registry of Motor Vehicles,543 A.2d 1307, 1309 (R.I. 1988); Carmody v. R.I. Conflict of InterestCommission, 509 A.2d 453, 458 (R.I. 1986). Therefore, this Court's review is limited to determining whether substantial evidence exists to support the Division's decision. NewportShipyard v. Rhode Island Commission for Human Rights,484 A.2d 893 (R.I. 1984). "Substantial evidence" is that which a reasonable mind might accept to support a conclusion. Id. at 897 (quoting Caswell v. George Sherman Sand Gravel Co.,120 R.I. 1981, 424 A.2d 646, 647 (1981)). This is true even in cases where the court, after reviewing the certified record and evidence, might be inclined to view the evidence differently than the agency. Berberian v. Dept. of Employment Security, 414 A.2d 480, 482 (R.I. 1980). This Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Milardo v. CoastalResources Management Council, 434 A.2d 266, 272 (R.I. 1981). When more than one inference may be drawn from the record evidence, the Superior Court is precluded from substituting its judgment for that of the agency and must affirm the agency's decision unless the agency's findings in support of its decision are completely bereft of any competent evidentiary support. Rocha v.State Public Utilities Comm'n, 694 A.2d 722, 726 (R.I. 1997). Questions of law, however, are not binding upon a reviewing court and may be freely reviewed to determine what the law is and its applicability to the facts. Carmody v. R.I. Conflict of InterestCommission, 509 A.2d at 458.
 Review of a Final Administrative Decision
Interstate initially argues that its own appeal is not properly before the Court since the Division's Report and Order do not constitute a "final order" which is presently reviewable under the APA.[2] Relying on Barrington School Comm. v. R.I.State Labor Relations Bd., 608 A.2d 1126 (R.I. 1992), Interstate submits that a decision becomes "final," and therefore reviewable, "when the consequences of the disposition are substantial and tangible." Interstate reasons that a conditional grant is one which subsequent events, such as the inability to fulfill a condition, may moot. Hence, Interstate claims that this Court does not have jurisdiction to review the Report and Order at this time. At oral arguments, the Division explains that, in a sense, every one of its decisions are conditional.
A close reading of the conditions convinces the Court that the Report and Order are presently reviewable. The first condition, requiring documentation of compliance with all necessary governmental regulations, adds nothing, save some photocopying, to Hi-Speed Ferry's obligations under a water carrier certificate were it unconditionally granted. The second condition, that the actual vessel and services conform to those outlined in the business plan and evidence in the record, merely restates what is implicit in the grant: the Division granted the Certificate subject to the evidence before it. The fourth condition, that Hi-Speed Ferry submit a proof of insurance and hand-deliver a copy of approved tariffs reflecting rates, charges and a schedule of runs, adds nothing, save some photocopying and the employ of a messenger service, to Hi-Speed Ferry's obligations under a water carrier certificate were it unconditionally granted. Likewise, the fifth condition, that the Division be allowed to inspect the vessel prior to service for compliance with the order, is simply a derivative of condition two, by allowing the Division to make certain that the ferry service which is approved for a certificate is the ferry service which is ultimately offered to the public.
The third condition requires that Hi-Speed Ferry have approved, with the Commission, the tariffs reflecting the rates and charges outlined in the business plan, namely $26.00 per round trip ticket.[3] This condition is no longer an issue because the Commission subsequently approved the $26.00 rate.[4]
 The Public Convenience and Necessity Standard
Many of Interstate's arguments concern the Division's finding that a high-speed ferry service would serve the public convenience and necessity. For example, Interstate argues that the Division misapplied the governing statute by issuing a certificate without finding that the service was required. Interstate also contends that the Division committed legal error by failing to recognize that convenience and necessity are separate requirements. Finally, Interstate maintains that the Division's decision is clearly erroneous, arbitrary, and capricious.
Rhode Island General Laws 1956 § 39-1-3, establishes a Public Utilities Commission (Commission) and a Division of Public Utilities and Carriers "to implement the legislative policy set forth in § 39-1-1 and to serve as the agencies of the state in effectuating the legislative purpose." Our legislature found and declared that it is:
 "the policy of the state to provide fair regulation of public utilities and carriers in the interest of the public, to promote availability of adequate, efficient and economical . . . transportation services . . . to the inhabitants of the state, to provide just and reasonable rates and charges for such services and supplies, without unjust discrimination, undue preferences or advantages, or unfair or destructive competitive practices, and to cooperate with other states and agencies of the federal government in promoting and coordinating efforts to achieve realization of this policy."
The Code of Rhode Island Rules explains that "the Division of Public Utilities and Carriers is a governmental body charged with the supervision and execution of all laws relating to public utilities and carriers and all regulations and orders of the Commission governing the conduct and charges of public utilities." R3 (a)-DPUC. "It is the function of the division to serve the commission in bringing to it all relevant evidence, facts, and arguments that will lead the commission in its quasi-judicial capacity to reach a just result." Providence GasCo. v. Burke, 419 A.2d 263, 270 (R.I. 1980).
Pursuant to the relevant portion of the governing statute, "no common carrier of persons and/or property operating upon water between termini within this state shall hereafter furnish or sell its services unless the common carrier shall first have made application to and obtained a certificate from the division certifying that public convenience and necessity required the services." G.L. 1956 § 39-3-3. Neither the statute, nor the Rules and Regulations governing the Division, define "public convenience and necessity."
Our Rhode Island Supreme Court is "vested with final responsibility for statutory construction." Gallison v. BristolSchool Committee, 493 A.2d 164, 166 (R.I. 1985). In exercising this duty, the Court will effectuate and establish the intent of the legislature. Lake v. State, 507 A.2d 1349, 1351 (R.I. 1984). Absent a contrary intent, the words in the statute must be given their plain and ordinary meaning. Lake, 507 A.2d at 1351. "However, where the provisions of a statute are unclear or subject to more than one reasonable interpretation, the construction given by the agency charged with its enforcement is entitled to weight and deference as long as the construction is not clearly erroneous or unauthorized." Gallison, 493 A.2d at 166. Moreover, "an agency's construction of its own regulations is entitled to substantial deference." Martin v. OccupationalSafety and Health Review Comm'n, 499 U.S. 144, 150, 111 S.Ct. 1171, 113 L.Ed. 117 (1991).
Our Supreme Court, in Abbott v. Public Utilities Comm'n,48 R.I. 196, 136 A. 490, 491 (1927), noted that "the expression `public convenience and necessity' has not a well defined and precise meaning." Nevertheless, the Court interpreted "public convenience" as referencing "something fitting or suited to the public need." Abbott, 136 A. at 491. The Court further explained that "the word `necessity' in the expression under consideration does not have reference to an indispensable necessity, but rather that the route in question appears to the commission to bereasonably requisite." Id. at 491 (emphasis added).[5]
Important factors for the Commission's consideration are:
 "the existing means of transportation, as to its substantial character and its probable permanence, also the investments of capital made by the owners of such existing means, the nature of the service that is being rendered, and, if such service is adequate, what will be the probable effect of admitting competition into a field now adequately served, and what effect such competition will probably have upon the receipts of existing lines of transportation, and as to whether, in the face of further competition, the adequacy of the existing service will be continued."
However, in Yellow Cab Co. v. Public Utilities Hearing Board,73 R.I. 217, 54 A.2d 28 (1947), the Supreme Court explained that increased competition is not a valid ground for denying a common carrier certificate. The Court reasoned that existing carriers do not have a legal right to maintain a monopoly upon the services rendered. Hence, "protecting existing investments from even wasteful competition must be treated as secondary to the first and most fundamental obligation of securing adequate service for the public."[6] Breen v. Division of Public Utilities,59 R.I. 134, 194 A. 719, 720 (1937) (quoting 3 Pond, Public Utilities
§ 746 (4th Ed.)).
Prior decisions of the Division shed light upon the agency's interpretation of the expression, "public convenience and necessity." For example, in New England Steamboat Lines, Inc., Division Docket MC-W-24, the applicant for a water carrier certificate sought authority to provide "purely recreational, sight seeing cruises" out of Newport Harbor. The Division approved the application, concluding that "the present public convenience and necessity justifies the operation." Similarly, inIn re: New England Steamboat Lines, Inc., Docket MC-W-28 (1984), the Division considered the application for a water carrier certificate where the proposed service was "targeted primarily at the public's recreational and entertainment needs rather than its transportation needs." The Division concluded that the proposed ferry service between Newport and Block Island served the public convenience and necessity.
In the instant case, the Division noted that "weighing the public convenience and necessity requires careful consideration of the facts and circumstances in each particular case." Report and Order at 9. After analyzing and reviewing relevant case law, the Division concluded that "the standard is not necessarily absolute `convenience' or absolute `necessity,' but rather, may likely be a blend of the two." Report and Order at 11-12. With those principles in mind, the Division conducted a thorough review of the evidence.
The Report and Order detailed the testimony of Charles Donadio, Jr. (Donadio) President of Galilee Cruises and a Principal of Hi-Speed Ferry, LLC, placing emphasis on his suggestion that "Island Hi-Speed Ferry will fulfill the customer need by providing a different type of ferry service to Block Island." The Division noted Donadio's identification of an unserved market of customers who do not travel on the existing ferry but would use Hi-Speed Ferry because of the reduction in travel time, the advanced ticketing option, and the "experience" of riding a catamaran. Report and Order at 14. The Division also quoted Timothy Tyrell, Ph.D. (Dr. Tyrell) who agreed that "the plan for a new ferry suggests a service that is considerably different from the existing ferry service," and stated that, "this should result in a larger influence on the overall market growth than on a shift of customers between the existing new service." Report and Order at 17.
After reviewing the testimony of several tourism industry representatives presented on behalf of Hi-Speed Ferry, the Division noted that each witness "reiterated the concept that the time savings offered by the [proposed ferry service] would be an inducement for tourists who utilize boat trips or those tourists who visit Rhode Island for a brief period of time." Report and Order at 17. Additionally, the Division examined testimony from members of the public and noted that many Block Island residents opposed the proposed service while many Narragansett residents supported the service. Report and Order at 19.
The Division found the testimony of economist, Lawrence Kunkel (Kunkel), to be "the most convincing evidence of public need." Report and Order at 22. After finding that his curriculum vitae and first-hand experience distinguished him from all other economists who had testified during the proceeding, the Division gave credence to Kunkel's theory that "the overlap on an indirect competitive basis will be far more injurious, if you will, to the airline [which offers flights to the Island] than to Interstate Navigation." The Division specifically agreed with Kunkel's observations and conclusions, and after hearing all the evidence and weighing the credibility of witnesses found that "the testimony of those witnesses who have experienced a need for the services that cannot be fulfilled by Interstate Navigation, is far more convincing." Report and Order at 25.
Next, the Division differentiated the current service offered by Interstate and the proposed service offered by Hi-Speed Ferry. The Division noted that the services differed in numerous ways, including the price for a round trip ticket, the passengers-only service offered by Hi-Speed Ferry, and the choice of a New Harbor port over an Old Harbor port. Report and Order at 26-29.
Finally, the Division expressed "strong reservations about the rationale of the protests" in the proceeding. Report and Order at 30. The Division quotes testimony from Interstate which it believes "evinces a monopolistic mind-set on the part of Interstate's management." Report and Order at 31. Also damaging to the credibility of Interstate's protests, in the eyes of the Division, was evidence that Interstate itself had contemplated the purchase of a high-speed ferry. Clearly, the Division analyzed the relevant case law surrounding the "public convenience and necessity" standard and properly applied the standard after an intensive review of the evidence. Accordingly, the Division's finding was not clearly erroneous, arbitrary or capricious and was not made in excess of its statutory authority.
 The Fit, Willing and Able Standard
Interstate also questions the Division's finding that Hi-Speed Ferry "is fit, willing and able" to provide the service proposed in its application. According to Interstate, the Division's Report and Order is clearly erroneous in making the finding because Hi-Speed Ferry had not secured financing, had not purchased a boat, had not hired personnel to run the business and had not finalized other components to offering the ferry service.[7] Alternatively, Hi-Speed Ferry attacks Interstate's argument, pointing out that Interstate would have the Division require an applicant for a certificate to outlay significant sums of money and enter legally binding contracts before receiving approval to offer the service.
Rhode Island General Law 1956 § 39-12-7 provides:
 "a certificate shall be issued by the administrator, after a hearing, to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application, if it is found that the applicant is fit, willing, and able properly to perform the service proposed and to conform to the provisions of this chapter and the requirements, orders, rules, and regulations of the administrator thereunder, and that the proposed service, to the extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise the application shall be denied."
The Division considered testimony of witnesses for both Interstate and Hi-Speed Ferry. Mark Hayward (Hayward), Deputy Director of the United States Small Business Administration (SBA), testified for Donadio. In Hayward's opinion, Donadio "is a very good small business person who has an understanding of the successful operation of a seasonal boating service." See Report and Order at 6. Hayward based his opinion on Donadio's application for, and ultimate award for, the SBA New England "Young Entrepreneur of the Year." The Division also found persuasive the testimony of numerous other witnesses for Donadio. For example, Lisa Konicki, of the Westerly Chamber of Commerce, commented that Donadio is "one of the most ambitious, professional businessmen in the region. . . . He is able to single-handedly take a project from concept to reality. He has built his business from the ground up, with sheer guts and determination. He has a marketing savvy and a sense for trends in the industry. . . . He is absolutely fit and able to manage a high speed ferry." Report and Order at 7.
Perhaps most damaging to Interstate's arguments on this point are the admissions of its own witnesses. Leonard Lardaro, Ph.D. (Dr. Lardaro), a Professor at the University of Rhode Island, raised several questions about whether Donadio is "fit" or "able" to provide the proposed ferry service. Under cross-examination, however, Dr. Lardaro conceded that it might not be a wise investment move for Donadio to spend millions of dollars securing a vessel, office space and equipment and finalizing permits and employment contracts before obtaining the necessary authority to operate. Report and Order at 4. Similarly, Walter Edge (Edge), a Certified Public Accountant serving as Consultant to Interstate, concluded that Donadio was not fit, willing and able to offer the ferry service. Yet when asked under cross-examination whether he thought it would be imprudent for Donadio "to waste a lot of time and perhaps money applying for loans here and there before it obtained the authority to operate a high speed ferry," Edge responded, "I suppose, yes." Report and Order at 5.
In the words of the Division, "the Division has not expected other applicants to invest millions of dollars into a business before applying for operating authority, and does not intend to do so now." Thus, "given Donadio's proven diligence as a businessman, the Division [was] satisfied that, if he [were] granted a certificate, he will overcome any unresolved financing, licensing or other issues that would otherwise prevent him from operating." Report and Order at 8. After a review of the entire record, the Court finds that the decision of the Division to grant the Certificate is supported by reliable, probative, and substantial evidence in the record and was not clearly erroneous.
 No Time Limitation on the Grant
Interstate's final argument finds fault with the Division's grant of a conditional certificate without any indication as to how long the grant will remain effective. Interstate suggests that, even assuming that the public convenience and necessity would currently be served by the proposed ferry service, Hi-Speed Ferry may need years to fulfill the conditions of the grant. At that time, Interstate reasons, the public convenience and necessity may have changed such that they would no longer be served by the proposed high-speed ferry service. Thus, Interstate concludes that the Division's order was in excess of its authority. This Court believes that the Report and Order inherently includes a "reasonable period of time" condition, however, the Court will remand the case to the Division so that it may determine what constitutes a "reasonable period of time."
 Conclusion
After a review of the entire record, the Court finds that the Report and Order of the Division approving Hi-Speed Ferry's application for a water-carrier certificate is supported by reliable, probative, and substantial evidence in the record and was not arbitrary and capricious. The Court further finds that substantial rights of the appellants, Interstate, and New Shoreham, have not been wrongfully prejudiced, and that the actions of the agency, in finding that the public convenience and necessity would be served by the proposed service, did not exceed statutory or constitutional authority.
Accordingly, the Court affirms the Division's grant of a water carrier certificate to the extent consistent with the above findings, modifies the grant to be effective for a reasonable period of time, and remands the case to the Division to establish the time span that shall constitute a "reasonable period of time." See 1956 G.L. § 42-35-15 (g).
Counsel for Hi-Speed Ferry shall present an order consistent with the foregoing after notice to all other counsel of record.
[1] The Block Island Residents Association (BIRA) submitted an amicus curiae brief to this Court.
[2] Interstate explains that it filed the instant appeal in order to protect its potential rights to review of the Division's Report and Order.
[3] In fact, Interstate takes issue with the Division's imposition of this condition, arguing that the Division acted in excess of its authority by invading the Commission's exclusive rate-making authority. While it is true that the Commission retains jurisdiction over rate-making. O'Neil v. Interstate Nav.Co., 565 A.2d 530 (R.I. 1989), the Division's conditional $26.00 rate was subject to full review by the Commission. See ProvidenceGas Co. v. Burke, 419 A.2d 263, 270 (R.I. 1980).
[4] This Court has been made aware of the fact that the Report and Order of the Commission which approved the $26.00 rate has been appealed to the Rhode Island Supreme Court.
[5] In fact, the governing statute, as it is currently in effect, provides a less stringent standard to an applicant for a water carrier certificate than does the statute in Abbott. The applicable statute in Abbott required the Division to specify that the public convenience and necessity require operation over the route in question, whereas G.L. 1956 § 39-3-3 requires the Division to certify that the public convenience and necessity require the services.
[6] In a related argument, New Shoreham and Interstate claim that this Court cannot allow Hi-Speed Ferry to cream-skim customers from Interstate with its peak-season, passenger-only ferry. Cream-skimming occurs when "common carriers, finding themselves either losing or suffering reduced returns on the profitable part of the business [are] forced increasingly to subsist on a diet of skimmed milk [and] will be unable to carry on in the thinner geographic and seasonal markets, with consequent destruction of service to large areas of the country and bodies of customers." Reply Brief of New Shoreham, p. 4 (citing Alfred E. Kahn, The Economics of Regulation, Vol. 2 (1971)). New Shoreham reasons that Block Island residents ultimately will suffer when Interstate's loss in customer base forces it to charge higher rates or cease offering its services. Interstate suggests that the Division acknowledged this possibility by placing the $26.00 round-trip rate condition within its Report and Order.
After noting that all of the cases cited by Interstate and New Shoreham are federal cases, this Court observes that the rationale underlying the cream-skimming argument is not dissimilar from that underlying the Division's consideration of protecting existing investment. Furthermore, as economist Lawrence Kunkel theorizes, Hi-Speed Ferry is more likely to attract existing customers of the airline rather than customers of Interstate. See infra p. 11. Thus, this Court finds that there is substantial evidence in the record that Hi-Speed Ferry's service will not cream-skim as to these remonstrants.
[7] For example, Interstate argues that Hi-Speed Ferry will never secure the zoning approval, which it contends is necessary, to use Payne's Dock. Alternatively, Hi-Speed claims that the Town of New Shoreham Zoning Board does not have jurisdiction over Payne's Dock; rather Hi-Speed Ferry asserts that the Coastal Resources Management Council (CRMC) has jurisdiction seaward of the mean high water mark. This Court will refrain from addressing these arguments at this time. Since compliance with all necessary government regulations is a condition of the grant, if Hi-Speed Ferry is unable to obtain the necessary permits, then jurisdiction over Payne's Dock is not an issue.